# United States Court of Appeals for the Federal Circuit

SOLARWORLD AMERICAS, INC.,
*Plaintiff-Appellant*

GOAL ZERO, LLC,
*Plaintiff*

v.

UNITED STATES, YINGLI GREEN ENERGY
HOLDING COMPANY LIMITED, YINGLI GREEN
ENERGY AMERICAS, INC., YINGLI ENERGY
(CHINA) CO., LTD., BAODING TIANWEI YINGLI
NEW ENERGY RESOURCES CO., LTD., TIANJIN
YINGLI NEW ENERGY RESOURCES CO., LTD.,
HENGSHUI YINGLI NEW ENERGY RESOURCES
CO., LTD., LIXIAN YINGLI NEW ENERGY
RESOURCES CO., LTD., BAODING JIASHENG
PHOTOVOLTAIC TECHNOLOGY CO., LTD.,
BEIJING TIANNENG YINGLI NEW ENERGY
RESOURCES CO., LTD., HAINAN YINGLI NEW
ENERGY RESOURCES CO., LTD.,
*Defendants-Appellees*

JINKO SOLAR IMPORT & EXPORT CO., LTD.,
JINKOSOLAR INTERNATIONAL LIMITED, JINKO
SOLAR CO., LTD., CHANGZHOU TRINA SOLAR
ENERGY CO., LTD., TRINA SOLAR (CHANGZHOU)
SCIENCE & TECHNOLOGY CO., LTD.,
*Defendants*

2018-1373

――――――――――――

Appeal from the United States Court of International Trade in Nos. 1:15-cv-00196-CRK, 1:15-cv-00231-CRK, Judge Claire R. Kelly.

――――――――――――

Decided: December 12, 2018

――――――――――――

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington, DC, argued for plaintiff-appellant. Also represented by STEPHANIE MANAKER BELL, TESSA V. CAPELOTO, LAURA EL-SABAAWI, CYNTHIA CRISTINA GALVEZ, USHA NEELAKANTAN, ADAM MILAN TESLIK, MAUREEN E. THORSON.

TARA K. HOGAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by REGINALD THOMAS BLADES, JR., JEANNE DAVIDSON, JOSEPH H. HUNT; MERCEDES MORNO, United States Department of Commerce, Washington, DC.

SHAWN MICHAEL HIGGINS, Sidley Austin LLP, Washington, DC, argued for defendants-appellees Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas, Inc., Yingli Energy (China) Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Lixian Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd., Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy Resources Co., Ltd. Also represented by NEIL R. ELLIS.

――――――――――――

Before NEWMAN, WALLACH, and STOLL, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant SolarWorld Americas, Inc. ("SolarWorld") sued Appellee United States ("the Government") in the U.S. Court of International Trade ("CIT"), challenging the U.S. Department of Commerce's ("Commerce") final results of an administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules ("subject merchandise") from the People's Republic of China ("China"). *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 80 Fed. Reg. 40,998, 40,998 (July 14, 2015) (final admin. review) ("*Final Results*"). After largely sustaining the *Final Results* but remanding for Commerce to reconsider an issue not implicated in this appeal, *see SolarWorld Ams., Inc. v. United States* (*SolarWorld I*), 234 F. Supp. 3d 1286, 1292 (Ct. Int'l Trade 2017), the CIT ultimately sustained Commerce's final results of remand redetermination, *see SolarWorld Ams., Inc. v. United States* (*SolarWorld II*), 273 F. Supp. 3d 1314, 1315 (Ct. Int'l Trade 2017); *see also* Final Results of Remand Redetermination, *SolarWorld Ams., Inc. v. United States*, No. 1:15-cv-00231-CRK (Ct. Int'l Trade Sept. 11, 2017), ECF No. 144-1; J.A. 56–57 (Judgment).

SolarWorld, a domestic producer of subject merchandise, appeals and argues Commerce erred in its calculation of antidumping duty margins. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012). We affirm.

BACKGROUND

I. Legal Framework

By statute, antidumping duties may be imposed on foreign merchandise sold, or likely to be sold, "in the

United States at less than its fair value." 19 U.S.C. § 1673 (2012).[1] At the conclusion of an investigation, if Commerce and the U.S. International Trade Commission have made the requisite findings, Commerce "shall publish an antidumping duty order" directing U.S. Customs and Border Protection ("Customs") officers to assess duties on imports of goods covered by the investigation. *Id.* § 1673e(a). Each year after the order is published, if Commerce receives a request for an administrative review of the order, it shall conduct such a review. *Id.* § 1675(a)(1).

For every administrative review, Commerce typically must "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." *Id.* § 1677f-1(c)(1). A dumping margin reflects the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'"[2] *U.S. Steel Corp. v.*

---

[1]    In June 2015, Congress amended the statutes containing the antidumping provisions. *See* Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27, § 502, 129 Stat. 362, 383–84. We review the *Final Results* in accordance with the TPEA because they issued after the TPEA became effective. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348–52 (Fed. Cir. 2015).

[2]    "When the foreign producer or exporter sells directly to an *unaffiliated* purchaser in the United States, Commerce uses [export price] as the U.S. price for purposes of the comparison." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1303 (Fed. Cir. 2001) (citation omitted). "However, where a sale is made by a foreign producer or exporter to an *affiliated* purchaser in the United States, the statute provides for use of [constructed

*United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (footnote omitted) (citing 19 U.S.C. § 1677(35)(A)).

The statute explains how "normal value shall be determined" "[i]n order to achieve a fair comparison with the export price or constructed export price." 19 U.S.C. § 1677b(a). However, if Commerce determines the exporting country is a "nonmarket economy country"[3] and "finds that available information does not permit the normal value of the subject merchandise to be determined under [§ 1677b(a)]," then Commerce calculates normal value by valuing the "factors of production" used in producing the merchandise in comparable "market economy country or countries." *Id.* § 1677b(c)(1). Specifically, Commerce must value the factors of production "to the extent possible . . . in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) signifi-

---

export price] as the [U.S.] price for purposes of the comparison." *Id.* (citation omitted). The calculation of constructed export price, as compared to export price, is subject to certain "[a]dditional adjustments." 19 U.S.C. § 1677a(d).

[3] A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under . . . § 1677b(a), the normal value of the subject merchandise." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 n.1 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

cant producers of comparable merchandise." *Id.* § 1677b(c)(4). Accordingly, in selecting these so-called surrogate values to represent the factors of production, Commerce "attempts to construct a hypothetical market value of that product in the nonmarket economy." *Downhole Pipe*, 776 F.3d at 1375 (internal quotation marks, brackets, and citation omitted).

## II. Procedural History

The present dispute stems from an antidumping duty order that Commerce issued after an investigation and that covers subject merchandise from China. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 73,018, 73,018 (Dec. 7, 2012) (antidumping duty order). In February 2014, following a timely request, Commerce initiated the administrative review at issue, covering a period of review of May 25, 2012, to November 30, 2013. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 79 Fed. Reg. 6147, 6147, 6150 (Feb. 3, 2014). Commerce limited its review to the two largest Chinese exporters of the subject merchandise by volume, Wuxi Suntech Power Co., Ltd. and Yingli Energy (China) Co., Ltd. ("Yingli"). J.A. 103; *see* 19 U.S.C. § 1677f-1(c)(2) (explaining when Commerce may limit its review to a "reasonable number of exporters or producers").

In July 2015, Commerce issued the *Final Results*. 80 Fed. Reg. at 40,998; *see* J.A. 4462–545 (providing excerpts from Commerce's decision memorandum accompanying the *Final Results*). Commerce calculated, inter alia, a weighted-average dumping margin for Yingli of 0.79%. *Final Results*, 80 Fed. Reg. at 41,001. Commerce's calculated margin is based in part on its selection of surrogate values for each of Yingli's factors of production, including aluminum frames, J.A. 4537–45, and semi-finished polysilicon ingots and blocks,

J.A. 4536–37. For aluminum frames, Commerce selected a value derived from import data based on Thai Harmonized Tariff Schedule ("HTS") Heading 7604 for "[a]luminum bars, rods[,] and profiles," specifically under Subheading 7604.29, which covers "[a]luminum bars, rods[,] and profiles" "[o]ther" than those specifically provided for in the other subheadings at a comparable level, J.A. 2910; *see* J.A. 4542, resulting in a surrogate value of 189.16 Thai Bahts per kilogram, *see* J.A. 4375 (identifying the surrogate value's price). For semi-finished polysilicon ingots and blocks, Commerce selected the "world market price for polysilicon of $18.19 per kilogram." J.A. 4537.[4]

SolarWorld sued the Government, arguing, inter alia, that Commerce should have calculated a higher anti-dumping duty margin for Yingli because Commerce erred by undervaluing the surrogate values for each of Yingli's inputs. *SolarWorld I*, 234 F. Supp. 3d at 1292. The CIT rejected each of SolarWorld's challenges. *Id.* at 1303–07. Although SolarWorld argued Commerce should have selected an aluminum frames surrogate value derived from import data for Thai HTS Heading 7616, specifically under Subheading 7616.99, which covers, inter alia, "articles of aluminum [not elsewhere specified or included]," rather than Thai HTS Heading 7604, which covers "[a]luminum bars, rods[,] and profiles," the CIT stated "Commerce reasonably determined that import data

---

[4] Commerce's selection of these surrogate values in the *Final Results* was unchanged from its preliminary results of the review. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 80 Fed. Reg. 1021, 1021 (Jan. 8, 2015) (preliminary admin. review); J.A. 4374–75 (listing Yingli's surrogate values for each factor of production in a spreadsheet).

under [Thai] HTS [H]eading 7604 is more specific." *Id.* at 1303–04 (internal quotation marks and citations omitted). The CIT also determined that Commerce reasonably selected a surrogate value for semi-finished polysilicon ingots and blocks as the best available information on the record for that factor of production, in part because it was the only surrogate value of record. *Id.* at 1306–07.

DISCUSSION

I. Standard of Review and Legal Standard

We apply the same standard of review as the CIT, *see Downhole Pipe*, 776 F.3d at 1373, upholding Commerce determinations that are supported "by substantial evidence on the record" and otherwise "in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i). "Although we review the decisions of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (internal quotation marks, brackets, ellipsis, and citation omitted). "Substantial evidence is defined as more than a mere scintilla, as well as evidence that a reasonable mind might accept as adequate to support a conclusion," and Commerce's "finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Downhole Pipe*, 776 F.3d at 1374 (internal quotation marks and citations omitted). We look to "the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (internal quotation marks and citation omitted).

When valuing factors of production in the nonmarket economy context, the statute directs that Commerce's decision "shall be based on the *best available information* regarding the values of such factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1) (emphasis

added). Commerce has "broad discretion" to determine what constitutes the best available information, as this term "is not defined by statute." *QVD Food Co. v. United States,* 658 F.3d 1318, 1323 (Fed. Cir. 2011). "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Qingdao Sea–Line Trading Co. v. United States,* 766 F.3d 1378, 1386 (Fed. Cir. 2014).

## II. Commerce's Selection of Surrogate Values for Both Aluminum Frames and Semi-Finished Polysilicon Ingots and Blocks Is Supported by Substantial Evidence and Otherwise in Accordance with Law

### A. Aluminum Frames

Commerce determined import data derived from Thai HTS Heading 7604 "constitute[s] the best available information to value Yingli's aluminum frames." J.A. 4542. Commerce found that that heading "pertain[s] to non-hollow aluminum profiles such as those consumed by Yingli in this review," J.A. 4543, and explained that the other data on the record for Thai HTS Heading 7616 "includes products dissimilar to aluminum frames," J.A. 4542. SolarWorld argues Yingli's aluminum frames are not described by Thai HTS Heading 7604's definition of aluminum profiles because they "are not uniform along their entire length." Appellant's Br. 16 (emphasis omitted). According to SolarWorld, "[b]ecause [Yingli's] aluminum frames have been further processed significantly beyond a mere extrusion, they have lost their character as an aluminum extrusion and have instead taken the form of a fabricated aluminum good," such that they "no longer fit within the definition of a 'profile.'" *Id.* at 20 (citation omitted). We disagree with SolarWorld.

Substantial evidence supports Commerce's finding that import data under Thai HTS Heading 7604 constitutes the best available information from which to value

Yingli's aluminum frames. Thai HTS Heading 7604 covers, inter alia, "[*a*]*luminum* bars, rods[,] and *profiles*," with the relevant subheading selected by Commerce including *non-hollow* profiles. J.A. 2910 (emphases added) (listing hollow profiles in one subheading and, in Thai HTS Subheading 7604.29, which is the relevant subheading, identifying "[o]ther" types of aluminum profiles); *see* J.A. 4542. Heading 7604's explanatory notes[5] describe aluminum profiles as "[r]olled, extruded, drawn, forged[,] or formed products . . . of *a uniform cross-section* along their whole length." J.A. 1384 (emphasis added). Yingli's factor of production for "aluminum frame for module installation/transportation" fulfills these criteria, with Yingli's questionnaire responses identifying the aluminum frames as "alloyed *aluminum profiles* that are *not hollow*." J.A. 1430 (emphases added). Regarding uniform cross-section, Commerce appropriately rejected

---

[5] "The World Customs Organization publishes the [explanatory notes] as its official interpretation of the Harmonized Commodity Description and Coding System [('the Harmonized System')], the global system of trade nomenclature . . . ." *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1163 n.6 (Fed. Cir. 2017) (internal quotation marks and citations omitted). "[T]he United States and its major trading partners . . . developed a single modern product nomenclature for international use as a standard system of classifying goods for customs," and therefore base their tariff classification schedules on the Harmonized System. *Michael Simon Design, Inc. v. United States*, 637 F. Supp. 2d 1218, 1220 (Ct. Int'l Trade 2009) (internal quotation marks, brackets, and citation omitted). For instance, in 1988, Congress passed legislation implementing the Harmonized Tariff Schedule of the United States ("HTSUS"). Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1201, 102 Stat. 1107, 1147.

SolarWorld's contention that Yingli's profiles do not have a uniform cross-section and stated "that[,] while certain aluminum frames purchased by [Yingli] contain corners [thereby implying that not all of their cross-sections are uniform], we do not believe that this would necessarily change their classification as aluminum profiles." J.A. 4544. SolarWorld misapprehends Commerce's statutory duty when it argues that "the definitions in the HTS are not mere guidelines or suggestions, but are *statutory* definitions with the force of law" that Commerce must follow. Appellant's Br. 17. Commerce is "not required to engage in a classification analysis" but instead is "required to determine which of the competing subheadings constituted the best available information." *Downhole Pipe*, 776 F.3d at 1379. Consequently, even if some aluminum frames do not contain perfectly uniform cross-sections as discussed in the explanatory note, Thai HTS Heading 7604 still constitutes the best available information under § 1677b(c)(1)(B), given the other similarities detailed above between Yingli's inputs and the products covered by Thai HTS Heading 7604. *See Home Meridian Int'l Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect.").

The plain text of Thai HTS Heading 7604 does not specify whether its reach is limited to unprocessed goods. *See* J.A. 2910. Heading 7604's explanatory notes, however, state that the heading specifically includes aluminum profiles that are "worked after production." J.A. 1384; *see* J.A. 1384 (explaining that Heading 7604 "covers cast or sintered products . . . , which have been subsequently *worked after production* . . . provided that they have not thereby assumed the character of articles or products of other headings" (emphasis added)). As a result, that Yingli's frames undergo *some* processing, such as corner cutting and cleaning, does not automatically remove them

from the ambit of Thai HTS Heading 7604. *See, e.g.*, J.A. 2664 (providing a flowchart of the processing steps). The other surrogate value source on the record is Thai HTS Heading 7616, which, in relevant part, covers products, such as "[n]ails, tacks, staples . . . , screws, bolts, nuts, screw hooks, rivets, cotters, cotter-pins, [and] washers," as well as "[c]loth, grill, netting[,] and fencing, of aluminum wire." J.A. 1403. Thai HTS Heading 7604's inclusion of aluminum profiles that are "worked after production," J.A. 1384, cuts against selection of Thai HTS Heading 7616, which by its own terms, covers "[o]*ther* articles of aluminum," i.e., those that are not elsewhere specified or included, J.A. 1403 (emphasis added). Commerce appropriately relied on Thai HTS Heading 7604 and supported its selection, recognizing that Thai HTS Heading 7616 "does not include anything similar to aluminum profiles that were further processed into frames" and Thai HTS Heading 7604 is "far more specific" to Yingli's inputs. J.A. 4545; *see Downhole Pipe*, 776 F.3d at 1379 (affirming Commerce's selection of a surrogate value based on Indian HTS import data where Commerce provided a "well-reasoned explanation of its selection process"). Therefore, substantial evidence supports Commerce's decision to value Yingli's aluminum frames based on Thai HTS Heading 7604.

SolarWorld's counterarguments are unavailing. Specifically, SolarWorld asserts Commerce erred by not following Customs' classification rulings that (1) classified similar aluminum frames under HTSUS Heading 7616 and another HTSUS heading, not at issue here, *see* Appellant's Br. 21; and (2) classified certain *"unfinished* aluminum articles under HTS[US H]eading 7604," *id.* at 23. According to SolarWorld, these Customs rulings are "uniquely instructive." Reply Br. 10. To the extent SolarWorld argues as a legal matter that Customs' rulings must be afforded more weight than other evidence on the record, we disagree. Whereas Customs is tasked with

"fix[ing] the final classification" of imported merchandise under the HTSUS, 19 U.S.C. § 1500; *see United States v. Mead Corp.*, 533 U.S. 218, 221–24 (2001) (outlining Customs' role in *classification*), Commerce is authorized to conduct administrative reviews of an antidumping duty order to "determine . . . the amount of any antidumping duty" necessary to remedy the effect of foreign merchandise being sold in the United States at less than its fair value, 19 U.S.C. § 1675(a)(1)(B); *see id.* § 1673. In accordance with this authorization, the statute affords Commerce "broad discretion" in identifying the best available information on the record to value factors of production. *QVD Food*, 658 F.3d at 1323; *see* 19 U.S.C. § 1677b(c)(1)(B).

Keeping in mind these differing statutory purposes that dictate Customs' and Commerce's respective roles, we are informed by Judge Pogue's conclusion in *Jiangsu Jiasheng Photovoltaic Technology Co. v. United States*. *See* 28 F. Supp. 3d 1317, 1336 (Ct. Int'l Trade 2014). There, the CIT held that "[t]he fact that Commerce has at times found support for its surrogate value choices in Customs classification rulings does not lead to the conclusion that Commerce must follow such rulings in every case [when valuing factors of production]." *Id.* Although "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight, including contradictory evidence or evidence from which conflicting inferences could be drawn," *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) (internal quotation marks and citation omitted); *see* 19 U.S.C. § 1516a(b)(1)(B)(i) (stating that Commerce's decision must be supported by "substantial evidence *on the record*" (emphasis added)), a Customs ruling is only one type of evidence for Commerce to consider. As SolarWorld acknowledges, Commerce is not bound by Customs rulings on imports for purposes of a best available information determination. *See* Appellant's Br. 22. Here,

Commerce considered the evidence and explained why the evidence should be afforded less significance. J.A. 4543–44; *see, e.g.*, J.A. 4544 (stating that one Customs ruling provided "*no explanation . . .* as to why the frames should be classified under [Thai] HTS [Heading 7616]" (emphasis added)).

Besides its claim of legal error, SolarWorld also invites us to reweigh the evidence already considered by Commerce. For example, SolarWorld avers Commerce "*failed to give appropriate weight* to," Appellant's Br. 21 (emphasis added), and "*failed to appropriately consider*" the aforementioned Customs rulings, *id.* at 23 (emphasis added). However, we may not reweigh the evidence in this case. *See Downhole Pipe*, 776 F.3d at 1377 ("While Appellants invite this court to reweigh this evidence, this court may not do so."). Accordingly, Commerce properly considered the record evidence to select a surrogate value for Yingli's aluminum frames.

## B. Semi-Finished Polysilicon Ingots and Blocks

Commerce determined the world market price for polysilicon is the best available information to value Yingli's semi-finished polysilicon ingots and blocks, as they "are comprised primarily of polysilicon." J.A. 4537. "[B]ecause Yingli self-produces most of its ingots and blocks, [Commerce] . . . accounted for the cost of the additional processing required to manufacture most of the ingots and blocks used in production." J.A. 4537. Commerce also noted that "no party submitted a [surrogate value] for ingots and blocks which were purchased." J.A. 4537. SolarWorld contends that Commerce "substantially undervalue[d]" this surrogate value by "valuing Yingli's ingot and block purchases using a value for virgin polysilicon." Appellant's Br. 28. According to SolarWorld, "Yingli's purchased semi-finished ingots and blocks are manufactured from virgin polysilicon *that undergoes significant processing*," such that Yingli paid a premium

for this input. *Id.* at 26 (emphasis added). We disagree with SolarWorld.

Substantial evidence supports Commerce's selection of a surrogate value for semi-finished polysilicon ingots and blocks as the best available information on the record. Commerce relied on the world market price for polysilicon, derived from two data sources, to value Yingli's input. *See* J.A. 4537; *see also* J.A. 4359 (laying out Commerce's calculation for this surrogate value in a factor of production valuation memorandum), 4375 (including the $18.19 per kilogram surrogate value in a spreadsheet for Yingli). After conducting a verification of Yingli's sales and factors of production, Commerce reported that Yingli's ingots and blocks are manufactured primarily from polysilicon, albeit polysilicon that is then further processed. *See* J.A. 4321. As the CIT observed, Commerce accounted for "processing costs . . . for most merchandise" because Yingli's "total purchases of ingots and blocks relative to the volume of ingots and blocks consumed during the period of review . . . was *not significant.*" *SolarWorld I*, 234 F. Supp. 3d at 1306 (footnote omitted); *see id.* (citing, inter alia, J.A. 1619–25). In addition, SolarWorld admits that, during the administrative proceedings, "it was unable to locate a surrogate value for polysilicon block and ingots," meaning the world market price was the *only* surrogate value information on the record. Appellant's Br. 29 n.4. "[T]he burden of creating an adequate record lies with interested parties and not with Commerce," but SolarWorld failed to meet that burden because it did not provide Commerce alternative surrogate value data. *QVD Food*, 658 F.3d at 1324 (internal quotation marks, brackets, and citation omitted). We conclude that substantial evidence supports Commerce's finding that the world market price was the best available information on the record.

SolarWorld's primary counterargument is that the record contained sufficient information from which Com-

merce *could have constructed* a surrogate value for Yingli's semi-finished polysilicon ingots and blocks. *See* Appellant's Br. 29–30; *id.* at 29 (describing a process in which Commerce would begin with the surrogate value for unprocessed polysilicon "and add[] to that [the costs associated with] the intermediate items and steps required to produce one unit of silicon ingot or silicon block"). Again, Commerce has "broad discretion" in determining how to value factors of production. *QVD Food*, 658 F.3d at 1323 (citation omitted). Commerce rejected SolarWorld's proposed construction methodology in reliance on Commerce's stated practice, which is to not "use a respondent's market economy purchase prices as benchmarks to determine whether a[ surrogate value] is appropriate because a respondent's market economy purchase prices are proprietary information [i.e., not publicly available] and are not necessarily representative of industry-wide prices available to other producers." J.A. 4537 (footnotes omitted); *see Qingdao*, 766 F.3d at 1386 (acknowledging that Commerce typically prefers prices that are, inter alia, "publicly available" and "reflect a broad market average").

Simply because an agency *may* deviate from its practice by "explain[ing] the reason for its departure," *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003); *see* Appellant's Br. 30 (recognizing this principle), we see no reason why Commerce *must* deviate from its practice where substantial evidence supports its selected surrogate value. SolarWorld does not argue that Commerce's stated practice is contrary to any statute or regulation. *See generally* Appellant's Br. Under such circumstances, "[t]he decision to select a particular methodology rests solely within Commerce's sound discretion." *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (internal quotation marks and citation omitted). Here, as discussed above, Commerce properly

selected a surrogate value for semi-finished polysilicon ingots and blocks.

## CONCLUSION

We have considered SolarWorld's remaining arguments and find them unpersuasive. Accordingly, the Judgment of the U.S. Court of International Trade is

**AFFIRMED**