# United States Court of Appeals
# for the Federal Circuit

---

**JINKO SOLAR CO., LTD., JINKO SOLAR IMPORT
& EXPORT CO., LTD., JINKOSOLAR (U.S.) INC.,**
*Plaintiffs*

**YINGLI GREEN ENERGY AMERICAS, INC., YINGLI
GREEN ENERGY HOLDING COMPANY LIMITED,
CANADIAN SOLAR, INC.**
*Intervenor-Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant*

**SOLARWORLD AMERICAS, INC.,**
*Intervenor-Defendant-Appellant*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SOLARWORLD AMERICAS, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**HANWHA SOLARONE (QIDONG) CO., LTD.,
HANWHA SOLARONE HONG KONG LIMITED,
YINGLI GREEN ENERGY AMERICAS, INC., YINGLI
GREEN ENERGY HOLDING COMPANY LIMITED,**

## CANADIAN SOLAR, INC.,
*Intervenor-Defendants*

—————————————

2018-2194

—————————————

Appeal from the United States Court of International Trade in Nos. 1:15-cv-00080-CRK, 1:15-cv-00086-CRK, Judge Claire R. Kelly.

—————————————

Decided:  June 15, 2020

—————————————

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington, DC, for appellant.  Also represented by LAURA EL-SABAAWI, USHA NEELAKANTAN, MAUREEN E. THORSON.

TARA K. HOGAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for appellee.  Also represented by JOSEPH H. HUNT, JEANNE DAVIDSON; KRISTEN MCCANNON, JAMES HENRY AHRENS, II, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

—————————————

Before NEWMAN, TARANTO, and STOLL, *Circuit Judges.*

NEWMAN, *Circuit Judge.*

The antidumping duty petition culminating in this appeal was filed by SolarWorld Americas, Inc. ("SolarWorld") concerning certain photovoltaic products imported from the People's Republic of China ("PRC").  This case arises from a Department of Commerce ("Commerce") antidumping duty investigation, reported at *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of*

*China*, 79 Fed. Reg. 44,399 (Dep't Commerce July 31, 2014) ("Preliminary Determination"); 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) ("Final Determination"). Appeal from these determinations was taken to the Court of International Trade ("CIT"), and after two remands the CIT affirmed the rulings of Commerce.[1]

This appeal to the Federal Circuit is directed to two of the issues reviewed by the CIT: first, Commerce's selection of Harmonized Tariff Schedule ("HTS") Heading 7604 for valuation of the aluminum frame inputs to the photovoltaic modules; and second, Commerce's method of offsetting the antidumping duty cash deposit rate to account for export subsidies.

We review Commerce's rulings on the same standards as applied by the CIT, and give "great weight to the informed opinion of the CIT." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (alterations omitted). We now affirm the decisions on appeal.

I

## *Valuation of the Aluminum Frame Inputs*

On petition filed by domestic industry, Commerce determines whether an imported product is sold in the United States at less than fair value. Commerce must make "a fair comparison . . . between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). When a product is imported into the United States from a non-market economy country, as China is designated, then in order to achieve a fair market price comparison, Commerce

---

[1]    *Jinko Solar Co. v. United States*, 229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017) ("CIT Op."); *Jinko Solar Co. v. United States*, 317 F. Supp. 3d 1314 (Ct. Int'l Trade 2018) ("CIT Dec.").

determines the "normal value" of the subject merchandise in a comparable market economy. This value is determined by valuing the factors of production and other commercial factors, as set forth in 19 U.S.C. § 1677b(c)(1)(B):

> [T]he normal value of the subject merchandise [is determined] on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. . . . [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

To value the aluminum frame inputs for the photovoltaic modules imported from China, Commerce selected market data for comparable imports under South African HTS subheading 7604. The CIT summarized Commerce's findings as follows:

> Commerce found that the best available information by which to value respondents' aluminum frames was the average value of South African imports under subheading 7604.29.65, HTS ("Aluminum alloy bars, rods and profiles, other than hollow profiles of a maximum cross-sectional dimension not exceeding 370 mm"), rather than Thai imports under subheading 7616.99, HTS, ("Articles of aluminum not otherwise specified or indicated: other") covering a more diverse array of aluminum products.

CIT Op. at 1351 (citing *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, Issues & Dec. Mem., A-570-010, POI Apr. 1, 2013–Sept. 30, 2013, at 48–50 (Dep't of Commerce Dec. 15, 2014) (adopted

in 79 C.F.R. 78,036 (Dec. 29, 2014)) ("Final Decision Memo").

SolarWorld argues that Commerce selected the incorrect HTS classification for these products, and that the CIT erred in sustaining Commerce's classification on the ground of "reasonableness." SolarWorld argues that HTS 7604 undervalues the aluminum frame input, and "did not accurately account for the additional processing that the input has undergone." SolarWorld Br. 3.

This question of valuation of aluminum frames as inputs was before this court in a concurrent appeal, now reported at *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018) ("*SolarWorld I*"). These appeals arose on different administrative records in Commerce. The appeal leading to *SolarWorld I* was co-pending with this appeal, and the decision issued after completion of briefing in the present appeal. The Jinko Solar plaintiffs (Jinko Solar Co., Ltd.; Jinko Solar Import & Export Co., Ltd.; and, Jinko Solar (U.S.) Inc.) and the Yingli plaintiffs/defendants (Yingli Green Energy Americas, Inc.; Yingli Green Energy Holding Company Limited) that are parties to the present appeal were also parties to *SolarWorld I*.[2]

In *SolarWorld I*, this court reviewed the decision of the CIT reported at *SolarWorld Americas, Inc., v. United States*, 273 F. Supp. 3d 1314 (Ct. Int'l Trade Oct. 31, 2017). On the question of valuation of the aluminum frame

---

[2] The record states that the present proceeding was necessitated to "close a 'loophole' that resulted when producers subject to the *Solar I* investigations . . . increased imports of modules assembled in the PRC with non-PRC cells so as to avoid the reach of the *Solar I* orders." Final Decision Memo at 17 (internal citation omitted).

inputs, this court reviewed Commerce's decision and that of the CIT, and concluded that:

> Thai HTS Heading 7604 still constitutes the best available information under § 1677b(c)(1)(B), given the other similarities detailed above between Yingli's inputs and the products covered by Thai HTS Heading 7604.

*SolarWorld I*, 910 F.3d at 1223. The selection of HTS classification under Heading 7604 is also the question of the present appeal.

In *SolarWorld I* the court explored all of SolarWorld's arguments regarding valuation of the aluminum frame inputs. For example, SolarWorld argues that HTS 7604 should not apply, compared with HTS 7616, because aluminum frames that have corners do not meet the definition of "profiles" under HTS 7604. SolarWorld also argues that Commerce erred in finding that "the frames are not of uniform cross section along their entire length as required in the Chapter Notes to Chapter 76." CIT Op. at 1352; *id.* at 1353 (explaining that Commerce found that "the frames' corners 'are only a small part of the aluminum frames used to build solar modules,'" and that it "is discernible that Commerce considers the corners [] not significant to alter the article from those covered by [HTS 7604.29]" (quoting Final Decision Memo at 50)).

The court in *SolarWorld I* had also reviewed the relationship between a prior classification by Customs and Border Protection ("CBP") that had selected HTS 7616 as applicable to the subject aluminum frames. The CIT again sustained Commerce's position that it is not bound by Customs' rulings, but "is bound instead by its statutory requirement to value inputs using the best available information." CIT Op. at 1352 (citing Final Decision Memo at 49). This court sustained Commerce's position and affirmed CIT's decision. *SolarWorld I*, 910 F.3d at 1225. The

same argument is presented herein, arguing the same Customs rulings for the same products.

Thus SolarWorld again argues that the aluminum frames are incorrectly classified under HTS Heading 7604 as factors of production, and that HTS Heading 7616 is the correct classification. SolarWorld states that although "based on different administrative records, both appeals involve the selection of a surrogate value for aluminum frames used in solar modules." SolarWorld Br. 1. No distinction is proposed between these frames as a factor of production of the solar modules.

We affirm the CIT's decision that "Commerce's use of subheading 7604.29.65, HTS, to value respondents' aluminum frames is supported by substantial evidence." CIT Op. at 1353. That ruling is affirmed.

## II

### *Offset of Cash Deposit Rates*

SolarWorld criticizes Commerce's methodology in implementing the statutes concerning the setting of antidumping duty cash deposit rates and offsetting these rates to account for countervailed export subsidies.

After Commerce has determined that the imported merchandise is being, or is likely to be, sold in the United States at less than fair value, Commerce estimates the weighted average dumping margin[3] for each exporter and producer, and orders the posting of a cash deposit or bond based on the estimated dumping margin. 19 U.S.C. § 1673d(c)(1)(B). Relevant to the cash deposit, 19 U.S.C.

---

[3]    The dumping margin is "the amount by which the normal value exceeds the export price (or the constructed export price) of the subject merchandise." 19 U.S.C. § 1677b(a)(2).

§ 1677a(c)(1)(C) requires adjustment of the export price by increasing "the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy."

The purpose is to avoid the double application of duties. Commerce explains that the theory "underlying [§ 1677a(c)(1)(C)] is that in parallel AD and CVD investigations, if [Commerce] finds that a respondent received the benefits of an export subsidy program, [the statute] presume[s that] the subsidy contributed to lower-priced sales of subject merchandise in the United States." Final Decision Memo at 38; *see Galvanized Steel Wire From the People's Republic of China*, Issues & Dec. Mem., A-570-975, POI July 1, 2010–Dec. 31, 2010, at 18 (Dep't of Commerce Mar. 19, 2012) (adopted in 77 Fed. Reg. 17,430 (Mar. 26, 2012) (explaining that the statute "requires a full adjustment of AD duties for CVDs based on export subsidies in all AD proceedings").

Here, Commerce offset the antidumping cash deposit rate by the cash deposit rate for certain subsidies in the parallel countervailing duty investigations. *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, Memorandum to the File, A-570-010 (Dep't Commerce Mar. 5, 2015) (adjusting dumping margin using rates in the companion countervailing duty investigation). The amount of export subsidies herein were determined by Commerce based on adverse facts available ("AFA") in the companion CVD investigation. 19 U.S.C. § 1677e(b) provides that when an "interested party has failed to cooperate" with requests for information, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017).

SolarWorld states that this offset, which lowers the antidumping duty margin, has the unintended effect of neutralizing the effect of the adverse inference in the

countervailing duty investigation. SolarWorld argues that as a result, the respondents may "achieve a more favorable result from their failure to cooperate than they would have if they cooperated fully." SolarWorld Br. 24. SolarWorld states that Commerce's methodology is not reasonable, and is contrary to law. The government observes that the statute is silent as to whether Commerce must offset cash deposit rates, and states that "SolarWorld has not explained why it would be more reasonable for Commerce to apply the adverse inference to the respondents twice." Gov't Br. 18.

The CIT addressed SolarWorld's argument that Commerce's offset practice negates the purpose of the adverse inference, that is, deterring non-compliance with Commerce's investigations. The CIT explained that an adverse-facts-available based export subsidy reflects the "amount of an export subsidy that actually benefited the subject merchandise," and that in estimating a subsidy rate based on an adverse inference, Commerce is guided by both "creating a proper deterrent to non-cooperation" and the statutory "corroboration requirement . . . which requires that the AFA rate 'be a reasonably accurate estimate of the respondent's actual rate.'" CIT Op. at 1360 (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

The CIT held that Commerce's offset practice is reasonable under the statutory plan, because it "fosters consistency in investigations and administrative reviews." CIT Op. at 1359–60 (citing Final Decision Memo at 39). The CIT explained that 19 U.S.C. § 1677a(c)(1)(C) provides for "offset [of] an export subsidy" through an increase in the export price or calculated export price by "the amount of any countervailing duty imposed on the subject merchandise." *Id.* at 1360. The CIT reasoned that in calculating an export subsidy rate based on adverse facts available, "Commerce is guided not only by creating a proper deterrent to non-cooperation," but "also by the corroboration

requirement in 19 U.S.C. § 1677e(c), which requires that the AFA rate 'be a reasonably accurate estimate of the respondent's actual rate.'" *Id.* (quoting *De Cecco*, 216 F.3d at 1032). The CIT explained that Commerce, in balancing accuracy and deterrence, "cannot avoid double-counting the export subsidy (*i.e.*, including the export subsidy in the CVD cash deposit rate while also including it in the AD cash deposit rate) without also undermining the deterrent effect of the adverse inference (*i.e.*, reducing the combined cash deposit rate)." *Id.*

The CIT concluded that "Commerce reasonably exercised its discretion to offset the AD margin by the AFA CVD rate to avoid estimating duties in the AD cash deposit rate that are reflected in the CVD cash deposit." *Id.* The CIT held that Commerce's practice is reasonable because it ensures that the adverse inference is applied only once. *Id.* at 1359.

We review administrative agency actions on the standard of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), whereby if "the intent of Congress is clear, that is the end of the matter;" *id.* at 842, but if the statute is ambiguous or does not include the aspect at issue, then the agency's interpretation must be accepted unless it is "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Ningbo Dafa Chem. Fiber Co. v. United States,* 580 F.3d 1247, 1253 (Fed. Cir. 2009) (applying *Chevron* to antidumping determinations).

We have considered the concerns raised by SolarWorld, and conclude that Commerce's practice with respect to offset of cash deposit rates reasonably implements the statute. This practice balances the dumping margin against deterrence, lowers the combined antidumping/countervailing cash deposit rate, and avoids the inequity of double application of duty. This practice was considered by the CIT in light of the statute, and the practice of Commerce was

deemed to be a reasonable implementation of the statutory purposes of balancing import value and facilitating investigation.  The CIT's decision on this aspect is affirmed.  *See SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) ("Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws." (brackets and internal quotation marks omitted) (quoting *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994))).

## CONCLUSION

The decision of the Court of International Trade is affirmed.

## **AFFIRMED**

Each party shall bear its costs.