# United States Court of Appeals for the Federal Circuit

_____

**WEISHAN HONGDA AQUATIC FOOD CO., LTD.,**
*Plaintiff*

**CHINA KINGDOM (BEIJING) IMPORT & EXPORT CO., LTD., SHANGHAI OCEAN FLAVOR INTERNATIONAL TRADING CO., LTD., DEYAN AQUATIC PRODUCTS AND FOOD CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, CRAWFISH PROCESSORS ALLIANCE,**
*Defendants-Appellees*

_____

2018-1375

_____

Appeal from the United States Court of International Trade in No. 1:16-cv-00073-MAB, Judge Mark A. Barnett.

_____

Decided: March 5, 2019

_____

YINGCHAO XIAO, Lee & Xiao, San Marino, CA, argued for plaintiffs-appellants. Also represented by DOUGLAS CAMPAU.

MOLLIE LENORE FINNAN, Commercial Litigation Branch, Civil Division, United States Department of

Justice, Washington, DC, argued for defendant-appellee United States. Also represented by JOSEPH H. HUNT, JEANNE E. DAVIDSON, PATRICIA M. MCCARTHY; BRENDAN SASLOW, SAAD YOUNUS CHALCHAL, Office of Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

WILL E. LEONARD, Adduci, Mastriani & Schaumberg, LLP, Washington, DC, for defendant-appellee Crawfish Processors Alliance. Also represented by JOHN STEINBERGER.

_____

Before DYK, WALLACH, and CHEN, *Circuit Judges.*

WALLACH, *Circuit Judge.*

This appeal concerns the U.S. Department of Commerce's ("Commerce") final results of an administrative review and a new shipper review of the antidumping duty order on freshwater crawfish tail meat ("subject merchandise") from the People's Republic of China ("China"). *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 81 Fed. Reg. 21,840, 21,840 (Dep't of Commerce Apr. 13, 2016) (final admin. review and new shipper review) ("*Final Results*"); *see also Freshwater Crawfish Tail Meat from the People's Republic of China*, 81 Fed. Reg. 23,457, 23,457 (Dep't of Commerce Apr. 21, 2016) (notice of correction to final admin. review and new shipper review) ("*Amended Final Results*").[1] Appellants China Kingdom (Beijing) Import & Export Co., Ltd. ("China Kingdom"), Ocean Flavor, and Deyan Aquatic Products and Food Co.,

_____

[1]    The *Amended Final Results* corrected the *Final Results*, which "incorrectly identified" Shanghai Ocean Flavor International Trading Co., Ltd. ("Ocean Flavor") by a different name. *Amended Final Results*, 81 Fed. Reg. at 23,457.

Ltd. ("Deyan") (collectively, "Chinese Respondents") argue the U.S. Court of International Trade ("CIT") erred in sustaining Commerce's calculations of weighted average dumping margins for each respondent. *Weishan Hongda Aquatic Food Co. v. United States*, 273 F. Supp. 3d 1279, 1293 (Ct. Int'l Trade 2017) (sustaining the margins calculated in the "*Final Results*, as corrected by the *Am*[*ended*] *Final Results* and as amended by the [Final Results of Remand Redetermination ('*Remand Results*')]"); *see* J.A. 733–43 (*Remand Results*);[2] *see also* J.A. 1–2 (Judgment).

The Chinese Respondents appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012). We affirm.

BACKGROUND

I. Legal Framework

By statute, antidumping duties may be imposed on foreign merchandise sold, or likely to be sold, "in the United States at less than its fair value." 19 U.S.C. § 1673 (2012).[3] At the conclusion of an investigation, if Commerce and the U.S. International Trade Commission have made the requisite findings, Commerce "shall publish an antidumping duty order" directing U.S. Customs and Border Protection officers to assess duties on imports of goods covered by the

---

[2]  In the *Remand Results*, Commerce did not change the margins calculated in the *Final Results*. *See* J.A. 733.

[3]  In June 2015, Congress amended the statutes containing the antidumping provisions. *See* Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27, §§ 501–507, 129 Stat. 362, 383–87. We review the *Final Results* in accordance with the TPEA because they issued after the TPEA became effective. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348–52 (Fed. Cir. 2015). Unless stated otherwise, we cite to the U.S. Code version of the statute when there are no material changes in the TPEA for purposes of this appeal.

investigation.  *Id.* § 1673e(a).  Each year after the order is published, if Commerce receives a request for an administrative review of the order, it "shall" conduct such a review. *Id.* § 1675(a)(1).  Similarly, if Commerce receives a request for a review by a new shipper of subject merchandise, it shall conduct such a review.  *See id.* § 1675(a)(2)(B)(i) (requiring a review where "an exporter or producer" establishes that they "did not export" subject merchandise and are not affiliated with an exporter or producer that did export subject merchandise "during the period of investigation"); *see also* 19 C.F.R. § 351.214(a) (2016) (referring to these reviews as "new shipper reviews").

When conducting these reviews, Commerce typically must "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise."  19 U.S.C. § 1677f–1(c)(1).  A dumping margin reflects the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'"[4]  *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (footnote omitted) (citing 19 U.S.C. § 1677(35)(A)).

---

[4]     "When the foreign producer or exporter sells directly to an *unaffiliated* purchaser in the United States, Commerce uses [export price] as the U.S. price for purposes of the comparison."  *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1303 (Fed. Cir. 2001) (citation omitted).  "However, where a sale is made by a foreign producer or exporter to an *affiliated* purchaser in the United States, the statute provides for use of [constructed export price] as the [U.S.] price for purposes of the comparison."  *Id.* (citation omitted).  The calculation of constructed export price, as compared to export price, is subject to certain "[a]dditional adjustments."  19 U.S.C. § 1677a(d).

The statute explains how "normal value shall be determined" "[i]n order to achieve a fair comparison with the export price or constructed export price." 19 U.S.C. § 1677b(a). However, if Commerce determines the exporting country is a "nonmarket economy country"[5] and "finds that available information does not permit the normal value of the subject merchandise to be determined under [§ 1677b(a)]," then Commerce calculates normal value by valuing the "factors of production" used in producing the merchandise in a comparable "market economy country or countries." *Id.* § 1677b(c)(1). Specifically, Commerce must value the factors of production "to the extent possible . . . in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." *Id.* § 1677b(c)(4). Accordingly, in selecting these so-called surrogate values to represent the factors of production, Commerce "attempts to construct a hypothetical market value of that product in the nonmarket economy." *Downhole Pipe*, 776 F.3d at 1375 (internal quotation marks, brackets, and citation omitted).

---

[5] A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under . . . § 1677b(a), the normal value of the subject merchandise." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 n.1 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

## II. Procedural History

In 1997, Commerce, after conducting an investigation, issued an antidumping duty order that covers freshwater crawfish tail meat from China. *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 Fed. Reg. 48,218, 48,219 (Dep't of Commerce Sept. 15, 1997) (antidumping duty order). Following timely requests, Commerce initiated an administrative review in October 2014, covering a period of review from September 1, 2013, to August 31, 2014. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 79 Fed. Reg. 64,565, 64,565, 64,567 (Dep't of Commerce Oct. 30, 2014) (initiation admin. review). Commerce limited its review to the two largest exporters of the subject merchandise by volume, thereby selecting China Kingdom and Deyan as mandatory respondents, while Ocean Flavor participated in the administrative review by seeking voluntary respondent status. J.A. 416; *see* J.A. 317–18 (deciding, by Commerce, to limit the review); *see also* 19 U.S.C. §§ 1677f–1(c)(2) (explaining when Commerce may limit its review to a "reasonable number of exporters or producers"), 1677m(a) (discussing the process for voluntary respondents). In addition, following timely requests, Commerce also initiated a new shipper review for three companies, including Weishan Hongda Aquatic Food Co., Ltd. ("Hongda"), covering the same period of review as the administrative review. *See Initiation of Antidumping Duty New Shipper Reviews*, 79 Fed. Reg. 64,749, 64,749 (Dep't of Commerce Oct. 31, 2014) (initiation of new shipper review). In November 2014, Commerce aligned the statutory time limits for issuance of the new shipper review with the deadlines of the concurrent administrative review. J.A. 314.

In October 2015, Commerce published the preliminary results of its administrative review and new shipper review. *See Freshwater Crawfish Tail Meat from the People's Republic of China*, 80 Fed. Reg. 60,624, 60,624 (Dep't of Commerce Oct. 7, 2015) (prelim. admin. review and new

shipper review) ("*Preliminary Results*"); *see also* J.A. 415–
30 (providing Commerce's decision memorandum accompa-
nying the *Preliminary Results*). For the *Preliminary Re-
sults*, Commerce explained in its accompanying decision
memorandum that, before selecting surrogate values, it
"determined that South Africa, Colombia, Bulgaria, Thai-
land, Ecuador, and Indonesia are countries that are at the
same level of economic development to that of [China]" and
further found that "Indonesia and Thailand are significant
producers of comparable merchandise [to freshwater craw-
fish tail meat], processed seafood." J.A. 418–19 (footnotes
omitted). Because of Commerce's regulatory preference "to
value [factors of production] in a single country," Com-
merce selected "Thailand as the primary surrogate coun-
try," given "the availability of factor values in Thailand
relative to Indonesia," "including, importantly, financial
statements." J.A. 419 (footnote omitted); *see* 19 C.F.R.
§ 351.408(c)(2) ("Except for labor . . . [Commerce] normally
will value all factors in a single surrogate country."). Com-
merce selected surrogate values for factors of production
and, relevant here, calculated three surrogate financial ra-
tios to represent (1) manufacturing overhead, (2) selling,
general, and administrative ("SG&A") expenses, and
(3) profit, "by averaging the non-proprietary information
taken from the 2012 financial statements of two Thai pro-
ducers of processed seafood," Surapon Food Public Com-
pany Ltd. ("Surapon") and Kiang Huat Sea Gull Trading
Frozen Food Public Company Ltd. ("Kiang Huat").
J.A. 429; *see* J.A. 686 (identifying the names of the two
Thai producers of processed seafood).

Although the period of review covered September 1,
2013, to August 31, 2014, Commerce explained that it
"[found] it appropriate to consider using the financial state-
ment of . . . two [Thai] seafood processors . . . for calendar
year 2012." J.A. 449. Commerce detailed that "the condi-
tion known as [Early Mortality Syndrome
('EMS')] . . . decimated shrimp populations in Thailand

covering calendar years 2013 and 2014, [thereby] sharply restricting the profitability of seafood processors *in that country*," but that calendar year 2012 was unaffected by EMS. J.A. 449 (emphasis added). Commerce noted that the Thai Financial Statements "do not identify energy expenses" and therefore Commerce was "unable to segregate and . . . exclude energy costs from the calculation of the surrogate financial ratio for overhead," per its normal practice in calculating these ratios. J.A. 449. Nevertheless, Commerce relied on the Thai Financial Statements, calculating surrogate financial ratios of 7.73% for manufacturing overhead, 2.45% for SG&A expenses, and 6.77% for profit. J.A. 449. Consequently, Commerce calculated a 0.00% weighted average dumping margin for each of the Chinese Respondents. *Preliminary Results*, 80 Fed. Reg. at 60,625.

Commerce issued the *Final Results* in April 2016. 81 Fed. Reg. at 21,840; *see* J.A. 684–96 (providing Commerce's decision memorandum accompanying the *Final Results*). In the *Final Results*, Commerce determined that the Thai Financial Statements from 2012 were no longer the best available information on the record by which to value the surrogate financial ratios. *See* J.A. 690–92. Commerce explained Surapon's and Kiang Huat's financial statements demonstrate that they "benefit from countervailing export subsidies and therefore are an unreliable source to value financial ratios." J.A. 692. Instead, Commerce relied on South African company Oceana Group's annual report ("Oceana Report"), stating that "South Africa is a significant producer of comparable merchandise." J.A. 692; *see* J.A. 692 (recognizing that, although Commerce's "preference is to value all surrogate values from a single country," Commerce has "the discretion to resort to a secondary surrogate country if the data from the primary surrogate [country] do not provide a viable option because they do not provide sufficient reliable sources of publicly available surrogate value data"). Commerce noted that the Oceana

Report is "contemporaneous with the [period of review]"
and "contains the necessary information for [Commerce] to
calculate appropriate financial ratios." J.A. 692 (footnote
omitted).

Based on the Oceana Report, Commerce calculated the
following surrogate financial ratios: 6.69% for manufactur-
ing overhead, 37.05% for SG&A expenses, and 20.05% for
profit. J.A. 699. Although the surrogate financial ratio for
manufacturing overhead slightly decreased from the *Pre-
liminary Results*, the other two surrogate financial ratios
markedly increased. *See* J.A. 449 (calculating, for the *Pre-
liminary Results*, surrogate financial ratios of 7.73% for
manufacturing overhead, 2.45% for SG&A expenses, and
6.77% for profit). As a result of, inter alia, the change to
the surrogate financial ratios made in the *Final Results*,
Commerce recalculated the weighted average dumping
margins from 0.00% to: 22.16% for China Kingdom, 12.04%
for Deyan, and 17.23% for Ocean Flavor. 81 Fed. Reg. at
21,841.

The Chinese Respondents and Hongda sued Appellee
United States ("the Government") in the CIT, challenging
the antidumping duty rates assigned to them. *See Weishan
Hongda*, 273 F. Supp. 3d at 1280; *see also* J.A. 45–46 (ex-
cerpts from the Complaint). The United States "requested
remand to address" the issue of "the factual basis for Com-
merce's determination that South Africa is a significant
producer of comparable merchandise." *Weishan Hongda*,
273 F. Supp. 3d at 1284. In the *Remand Results*, Com-
merce calculated the same margins as it did in the *Final
Results*, "continu[ing] to find it appropriate to rely on" the
Oceana Report because it determined that South Africa is
at "the same level of economic development as China" and
"is a significant producer of comparable merchandise."
J.A. 733–34 (footnote omitted). Commerce explained that
"[Global Trade Atlas] export data and the 'export revenue'
figure reported in [the] Oceana [Report], sufficiently
demonstrate that South Africa is a significant producer of

comparable merchandise." J.A. 741. Following the *Remand Results*, the Chinese Respondents and Hongda represented to the CIT that "they no longer challenge Commerce's finding that South Africa is a significant producer of comparable merchandise." *Weishan Hongda*, 273 F. Supp. 3d at 1285 (footnote omitted). Instead, the Chinese Respondents argued Commerce erred by relying on the Oceana Report "to value financial ratios." *Id.*

The CIT ultimately "sustain[ed] Commerce's *Final Results*, as corrected by the *Am*[*ended*] *Final Results* and as amended by the *Remand Results*." *Id.* at 1293 (third italics added). As a preliminary matter, the CIT found that the Chinese Respondents and Hongda "chose to [administratively] exhaust some, but not all, of their arguments against using the data in the Oceana Report." *Id.* at 1288. The CIT upheld Commerce's reliance on the Oceana Report as the best available information, recognizing that "Commerce compared the Thai and South African statements and determined that the taint of countervailable subsidies in conjunction with the [energy input] disaggregation issues in the Thai statements outweighed any perceived flaws in the Oceana Report." *Id.* at 1292; *see* 19 U.S.C. § 1677(5)–(5B) (defining countervailable and noncountervailable subsidies). According to the CIT, although Hongda raised concerns regarding the use of the Oceana Report due "to the basket category for cost of sales and the aggregation of labor and raw materials therein," Commerce sufficiently addressed those concerns by recognizing "its ability to use its preferred methodology." *Weishan Hongda*, 273 F. Supp. 3d at 1292.

## DISCUSSION

The Chinese Respondents argue Commerce "improperly rejected the two Thai financial statements . . . in favor of [the Oceana Report] in the calculation of surrogate financial ratios." Appellants' Br. 9. Appellee Crawfish Processors Alliance ("CPA"), a domestic interested party during

Commerce's proceedings, contends the Chinese Respondents' surrogate financial ratio arguments "are barred by [their] failure to exhaust administrative remedies" and therefore the CIT lacked jurisdiction over this claim. CPA's Br. 19 (capitalization modified); *see id.* at 19–22. After articulating the appropriate legal standards, we address CPA's threshold argument and then the Chinese Respondents' argument.[6]

---

[6] CPA also argues "this court lacks jurisdiction with respect to the final results of the [new shipper review]" for Hongda because only the Chinese Respondents, which were parties to the *administrative* review, filed a notice of appeal of the Judgment. CPA's Br. 17 (capitalization modified). We agree. An administrative review and new shipper review are separate and independent segments of a proceeding. *See* 19 C.F.R. § 351.102(b)(47) (explaining that each "segment of a proceeding" "is reviewable"); *see also id.* § 351.102(b)(2) (defining administrative review as a review under § 1675(a)(1)), (b)(33) (defining new shipper review as a review under § 1675(a)(2)). In this case, Commerce aligned the administrative review and new shipper review. J.A. 314. The CIT's Opinion sustained, on the merits, Commerce's surrogate financial ratio determination in both the administrative review and new shipper review, *see Weishan Hongda*, 273 F. Supp. 3d at 1293, and it entered its Judgment accordingly, J.A. 1. Hongda, which requested a new shipper review, did not file a notice of appeal of the Judgment, and therefore we may not provide redress to Hongda in this appeal brought by the Chinese Respondents. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (acknowledging "the general prohibition on a litigant's raising another person's legal rights" (internal quotation marks and citation omitted)). The issue of our jurisdiction is separate from the issue of whether the CIT had jurisdiction to consider the merits of

## I. Standard of Review

We apply the same standard of review as the CIT, *see Downhole Pipe*, 776 F.3d at 1373, which upholds Commerce's determinations that are supported "by substantial evidence on the record" and otherwise "in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i). "Although we review the decisions of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (internal quotation marks, brackets, ellipsis, and citation omitted). "Substantial evidence is defined as more than a mere scintilla, as well as evidence that a reasonable mind might accept as adequate to support a conclusion," and Commerce's "finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Downhole Pipe*, 776 F.3d at 1374 (internal quotation marks and citations omitted). "We look to the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018) (internal quotation marks and citation omitted).

## II. CIT's Jurisdiction

### A. Legal Standards

"Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). A court "may not assume jurisdiction for the purpose of deciding the merits of the case." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,

---

Hongda's surrogate financial ratio arguments raised during the new shipper review. We address the CIT's jurisdiction below.

549 U.S. 422, 431 (2007). "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (internal quotation marks, brackets, and citation omitted). Where jurisdiction is lacking, "the proper course would be to dismiss on that ground." *Sinochem*, 549 U.S. at 436.

"We review a decision of the [CIT] on whether to require exhaustion in a particular case for abuse of discretion." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017). The CIT "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "[T]his statutory mandate indicates a congressional intent that, absent a strong contrary reason, the [CIT] should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang*, 856 F.3d at 912 (internal quotation marks and citation omitted).

## B. The CIT Had Jurisdiction to Reach the Merits of the Chinese Respondents' Claims

In assessing CPA's argument whether the Chinese Respondents exhausted their administrative remedies where they did not raise the issue of surrogate financial ratios in their case briefs in the administrative review, but where Hongda raised the issue in the "separate, but aligned" new shipper review, the CIT said "[i]n light of the decision on the merits of this case, the court *need not resolve* CPA's argument." *Weishan Hongda*, 273 F. Supp. 3d at 1289, 1290 (emphasis added). Instead, the CIT acknowledged the Government's representation "that it was not asserting the doctrine of administrative exhaustion against the [Chinese Respondents] because Commerce had examined surrogate values jointly for both reviews, relying on the same evidence and arriving at the same determination." *Id.* at 1289. Therefore, the CIT "turn[ed] to the merits of

[Chinese Respondents' and Hongda's] exhausted arguments." *Id.* at 1290 (footnote omitted).

CPA now argues the CIT lacked jurisdiction over the Chinese Respondents' claims due to the Chinese Respondents' failure to exhaust the surrogate financial ratios arguments during the administrative review. *See* CPA's Br. 17–22. According to CPA, although the administrative review and new shipper review were aligned, they are separate and independent proceedings, such that the Chinese Respondents cannot bootstrap their surrogate financial ratios arguments to Hongda's surrogate financial ratios arguments made during the new shipper review. *See id.* at 17. CPA contends that, because the Chinese Respondents did not file any case briefs during the administrative review, *see id.* at 8–11, they failed to exhaust their administrative remedies in the administrative review, thereby depriving the CIT of jurisdiction over the Chinese Respondents' claims regarding the surrogate financial ratios, *id.* at 19–22. We disagree.

"[E]xhaustion of administrative remedies is required where Congress imposes an exhaustion requirement by statute." *Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 579 (1989) (citations omitted). "But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) (citation omitted). "[T]he initial question whether exhaustion is required should be answered by reference to congressional intent; and a court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent." *Patsy v. Bd. of Regents*, 457 U.S. 496, 501–02 (1982) (footnote omitted).

We clarify that the requirement to exhaust administrative remedies under § 2637(d) is *not* jurisdictional.[7] We acknowledge that we have occasionally referred to the requirement to exhaust administrative remedies under § 2637(d) as having jurisdictional effect. *See, e.g.*, *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) ("The doctrine of exhaustion provides that no one is entitled to *judicial relief* for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." (emphasis added) (internal quotation marks and citation omitted)); *Belgium v. United States*, 551 F.3d 1339, 1349 (Fed. Cir. 2009) ("Under the circumstances[,] there was no failure to exhaust available administrative remedies. Thus the trial court *properly exercised jurisdiction*, and [appellee]'s claim on the merits is also not barred by the exhaustion doctrine." (emphasis added) (citation omitted)); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003) (considering exhaustion under § 2637(d) as part of "the *jurisdictional inquiry*" and stating "[w]hile enforcing exhaustion requirements as *jurisdictional prerequisites*, the [CIT] also enjoys discretion to identify circumstances where exhaustion of administrative remedies does not apply" (emphases added)). However, "[c]ourts . . . have been less than meticulous" when classifying requirements as jurisdictional, and we find that to be the case here. *See Kontrick v. Ryan*, 540 U.S. 443, 454 (2004). None of the cases discussed above actually decided the issue of whether § 2637(d) is jurisdictional; rather, they simply reference jurisdiction in passing. *See Essar Steel*,

---

[7]    We do not suggest that exhaustion is not jurisdictional under other agency statutes. "Exhaustion requirements are sometimes regarded as jurisdictional and sometimes not." *St. Bernard Par. Gov't v. United States*, No. 2018-1204, 2019 WL 638118, at *4 (Fed. Cir. Feb. 15, 2019).

753 F.3d at 1374; *Belgium*, 551 F.3d at 1349; *Consol. Bearings*, 348 F.3d at 1003.

In analyzing § 2637(d), we have explicitly "held that exhaustion is not strictly a jurisdictional requirement and therefore the [CIT] may waive the requirement at the court's discretion." *United States v. Nitek Elecs., Inc.*, 806 F.3d 1376, 1381 (Fed. Cir. 2015). This conclusion is correct because § 2637(d) speaks in general terms and Congress did not identify under which particular circumstances administrative remedies should be exhausted. *See* 28 U.S.C. § 2637(d); *see also Maggitt v. West*, 202 F.3d 1370, 1377 (Fed. Cir. 2000) ("It is well settled that when Congress has not clearly mandated the exhaustion of particular administrative remedies, the exhaustion doctrine is not jurisdictional, but is a matter for the exercise of 'sound judicial discretion.'" (quoting *McCarthy*, 503 U.S. at 144)). Instead, § 2637(d) affords the CIT discretion through its inclusion of its "where appropriate" clause, *see* 28 U.S.C. § 2637(d) ("[T]he [CIT] shall, *where appropriate*, require the exhaustion of administrative remedies." (emphasis added)), which is at odds with traditional notions of jurisdiction, *see United States v. Priority Prods., Inc.*, 793 F.2d 296, 300 (Fed. Cir. 1986) (explaining that "Congress appears to have recognized" § 2637(d)'s non-jurisdictional nature "by granting the [CIT] some discretion to excuse the failure to exhaust administrative remedies"); *see also Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145–46 (Fed. Cir. 2013) (recognizing the CIT, in its discretion, should assess whether exhaustion is required by considering "the purposes served by requiring exhaustion in the particular case" and outlining specific, court-recognized exceptions to the exhaustion requirement). Congress has not evinced a contrary intent. *See* H.R. Rep. No. 96-1235, at 57 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3729, 3769 (recognizing that "[s]ubsection (d) states a *general rule*" of exhaustion). Congress did not render § 2637(d) jurisdictional, so the CIT was not prevented from considering the merits of the

Chinese Respondents' claims, *see Sinochem*, 549 U.S. at
431 (explaining a federal court may not assume jurisdiction), as doing so does not violate separation of powers principles, absent a legislatively erected jurisdictional bar, *see
Ruhrgas*, 526 U.S. at 585 (explaining that "separation of
powers" concerns require a court to ascertain jurisdiction
before reaching the merits).[8]

### III. Surrogate Financial Ratios

### A. Legal Standard

When valuing factors of production in the nonmarket
economy context, the statute directs that Commerce's decision "shall be based on the *best available information* regarding the values of such factors in a market economy
country or countries." 19 U.S.C. § 1677b(c)(1) (emphasis
added). Commerce has "broad discretion" to determine
what constitutes the best available information, as this
term "is not defined by statute." *QVD Food Co. v. United
States,* 658 F.3d 1318, 1323 (Fed. Cir. 2011). Pursuant to
Commerce's stated practice, it "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average,
and are contemporaneous with the period of review." *Qingdao Sea–Line Trading Co. v. United States,* 766 F.3d 1378,
1386 (Fed. Cir. 2014) (footnote omitted). To value

---

[8] Our holding today should not be understood as allowing the CIT to routinely bypass the issue of exhaustion
and proceed to the merits. For instance, § 2637(d) indicates "a congressional intent that, absent a strong contrary
reason, the [CIT] should insist that parties exhaust their
remedies." *Boomerang,* 856 F.3d at 912 (internal quotation
marks and citation omitted); *see JBF RAK LLC v. United
States*, 790 F.3d 1358, 1366 (Fed. Cir. 2015) (indicating the
CIT typically "takes a strict view" of exhaustion (internal
quotation marks and citation omitted)).

surrogate financial ratios of manufacturing overhead, SG&A expenses, and profit, Commerce "normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.408(c)(4). "Generally, if more than one producer's financial statements are available, Commerce averages the financial ratios derived from all the available financial statements." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (citation omitted).

B. Commerce's Selection of the Oceana Report to Calculate Surrogate Financial Ratios Is Supported by Substantial Evidence and Otherwise in Accordance with Law

Commerce determined the Thai Financial Statements were not the best available information because "information on the record indicates that these Thai companies benefitted from countervailable export subsidies." J.A. 691 (footnote omitted). According to Commerce, the Thai Financial Statements demonstrate that Surapon and Kiang Huat "received export subsidies under the Investment Promotion Act." J.A. 691. Instead, Commerce relied on the Oceana Report, explaining that it is "a viable alternative" because it is "contemporaneous with the [period of review]" and "contains the necessary information for [Commerce] to calculate appropriate financial ratios." J.A. 692 (footnote omitted) (citing J.A. 698–99). Commerce explained that, compared to the Thai Financial Statements that did not separately identify energy costs, the Oceana Report "enable[d Commerce] to follow [its] normal methodology, i.e., the energy costs are included in the [materials, labor, and energy costs] denominator and not the overhead numerator to the calculation." J.A. 699 (italics omitted). The Chinese Respondents argue Commerce should have used the Thai Financial Statements to calculate surrogate financial ratios, and that it erred by summarily rejecting the Thai Financial Statements "on subsidy grounds without weighing them against the inferior data quality of [the] Oceana

[Report].” Appellants’ Br. 16 (capitalization modified). We disagree with the Chinese Respondents.

The TPEA states that, “[i]n valuing the factors of production,” Commerce “may disregard price or cost values without further investigation if [Commerce] has determined that broadly available export subsidies existed or particular instances of subsidization occurred.” Pub. L. No. 114-27, § 505(b), 129 Stat. at 386 (amending § 1677b(c)).[9] By regulation, “[Commerce] will consider a subsidy to be an export subsidy if the Secretary determines that eligibility for, approval of, or the amount of, a subsidy is contingent upon export performance.” 19 C.F.R. § 351.514(a).

Substantial evidence supports Commerce’s determination that the Oceana Report is the best available information on the record to value the surrogate financial ratios. Surapon and Kiang Huat’s financial statements reveal that each received export subsidies under Thailand’s Investment Promotion Act. *See* J.A. 501 (stating, in Kiang Huat’s financial statement, “[b]y virtue of the provisions of the . . . Investment Promotion Act . . . , [Kiang Huat] ha[s] been granted privileges by the Board of Investment relating to manufacturing of frozen seafood products” and listing certain exemptions), 603 (providing similar language in Surapon’s financial statement).[10] Commerce has previously determined that subsidies provided under Thailand’s Investment Promotion Act are countervailable export

---

[9] The legislative history to the pre-TPEA version of the statute similarly provided that, when valuing factors of production, “Commerce shall avoid using any prices which it has reason to believe or suspect may be . . . subsidized.” H.R. Rep. No. 100-576, at 590–91 (1988) (Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1623–24.

[10] The Chinese Respondents state they “never argued that the Thai [F]inancial[ Statements] were free of subsidies.” *See* Appellants’ Br. 18.

subsidies pursuant to § 351.514(a) because the benefits provided under that statute are export contingent. *See* J.A. 691–92 & n.25 (first citing *Certain Frozen Warmwater Shrimp from Thailand*, 78 Fed. Reg. 50,379 (Dep't of Commerce Aug. 19, 2013) (final neg. determination); then citing Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Frozen Warmwater Shrimp from Thailand, Case No. C-549-828, at 9, 19–22 (Dep't of Commerce Aug. 12, 2013), https://enforcement.trade.gov/frn/summary/thailand/2013-20166-1.pdf (finding that certain Investment Promotion Act subsidies satisfied the definition of countervailable subsidies under § 1677(5A)). The Chinese Respondents do not challenge this finding. *See generally* Appellants' Br. Therefore, under the TPEA, Commerce properly questioned the reliability of the Thai Financial Statements as tainted by countervailable export subsidies. *See* Pub. L. No. 114-27, § 505(b), 129 Stat. at 386 (allowing Commerce to "disregard price or cost values . . . if [Commerce] has determined that broadly available export subsidies existed"); *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1374–75 (Fed. Cir. 2016) (holding that, where Commerce determined "it had a reasonable basis to believe or suspect that [a foreign producer]'s purchases of [certain inputs from Korea] benefited from [export] subsidies," Commerce was justified in employing "essentially a presumption-based approach" to not rely on those Korean prices to value those inputs because this was a reasonable application of the statute).

In addition, Commerce appropriately relied on the Oceana Report as preferable to the Thai Financial Statements. Unlike the Thai Financial Statements, the Oceana Report enabled Commerce to use its "normal methodology" to calculate the manufacturing overhead ratio by including energy costs in the denominator of the calculation. *See* J.A. 699 (explaining this in Commerce's surrogate value memorandum for the *Final Results*); *see also* J.A. 704 (identifying

by Commerce in a spreadsheet that the Oceana Report reflects energy costs as zero because it considered energy costs to be included under raw materials costs). Had Commerce not employed its normal methodology, it would not have been able to calculate surrogate values for the Chinese "[R]espondents' energy inputs" due to concerns of "double-counting energy costs" in the surrogate financial ratios. J.A. 429, 429 n.66. "[T]he decision to select a particular methodology rests solely within Commerce's sound discretion." *SolarWorld*, 910 F.3d at 1226 (internal quotation marks and citation omitted). Because the Chinese Respondents have not challenged Commerce's normal methodology as unsupported or unlawful, *see generally* Appellants' Br., we conclude it was not error for Commerce to consider the fact that the Oceana Report allowed it to employ its normal methodology, which would avoid double counting, as a reason to prefer the Oceana Report, *see SolarWorld*, 910 F.3d at 1226 (holding Commerce is not required to deviate from its normal methodology in selecting surrogate values, absent a legitimate reason).

Moreover, although Commerce recognized that "we do not have an established hierarchy that automatically gives certain characteristics (i.e., contemporaneity or specificity) more weight than others," J.A. 691 (italics omitted), Commerce stated that the Oceana Report contained information that "is contemporaneous with the [period of review]" for the present administrative review, J.A. 692. Given that the statute acknowledges the import of contemporaneity when calculating antidumping margins, 19 U.S.C. § 1675(a)(1) (providing for annual, periodic reviews); *see Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1356 (Fed. Cir. 2016) ("In assessing the reasonableness of Commerce's methodology, our analysis is guided by the statute's manifest preference for contemporaneity in periodic administrative reviews."), Commerce appropriately relied on this fact in selecting the Oceana Report as the best available information on the

record, *see Qingdao,* 766 F.3d at 1386 (identifying "contemporaneous with the period of review" as one criterion in selecting surrogate values). Accordingly, Commerce's surrogate financial ratios determination is supported by substantial evidence.[11]

The Chinese Respondents' counterarguments are unavailing. First, they argue that § 505(b) of the TPEA "merely gives Commerce discretion, rather than a mandate," to disregard prices distorted by export subsidies. Appellants' Br. 19. They maintain that "Commerce is required to establish that the alternative financial is more reliable and representative." *Id.* at 18 (emphasis and citation omitted). While they are correct that Commerce's analysis when selecting the "best available information" on the record inherently involves a comparison of the competing data sources to identify what available information is "best" to value factors of production, 19 U.S.C. § 1677b(c)(1), the Chinese Respondents are incorrect in contending that Commerce failed to conduct such a comparison here. Commerce stated its practice of rejecting "financial statements where there is evidence that the company received countervailable export subsidies *and*

---

[11] The Chinese Respondents also argue that, if we hold Commerce improperly calculated the surrogate financial ratios, thereby affecting the weighted average dumping margins for mandatory respondents China Kingdom and Deyan, then we should hold that "Ocean Flavor's separate rate was . . . contrary to law and not supported by substantial evidence." Appellants' Br. 9. Because we reject the Chinese Respondents' argument on the surrogate financial ratios issue, we need not address this conditional argument. *Cf. Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1381 (Fed. Cir. 2005) (refusing to address the merits of a conditional argument where we affirmed the primary issue on appeal).

*where* [*it has*] *other more reliable and representative data on the record.*" J.A. 690 (emphasis added). Commerce then found that the Thai Financial Statements suffered from distortions due to export subsidies, and it explained that the Oceana Report was "a viable alternative," while addressing the challenges made to the Oceana Report. J.A. 692. Because Commerce supported these findings with substantial evidence, as discussed above, we hold it properly conducted a best available information analysis. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." (citation omitted)).

Second, the Chinese Respondents argue the Oceana Report is unreliable for calculating surrogate financial ratios because it "yields a distorted overhead ratio" due to "lack of a breakout for raw material costs and the inclusion of an anomalous line item 'overhead expenditure.'" Appellants' Br. 16. Regarding an alleged distorted overhead ratio, the Chinese Respondents fail to explain how the Oceana Report's failure to break out raw materials causes a distortion to the overhead ratio. *See generally id.* Instead, Commerce was able to use its normal methodology to "calculate appropriate financial ratios," despite the Oceana Report's failure to "provide disaggregated expenses for raw materials or labor cost," J.A. 692, because Commerce's manufacturing overhead ratio groups "materials, labor, and energy costs" in the denominator, J.A. 699. Regarding an alleged anomalous overhead expenditure, the CIT found that no party exhausted this particular argument before Commerce. *See Weishan Hongda*, 273 F. Supp. 3d at 1288 (stating Hongda "did not present to Commerce in the first instance its argument[] about possible misallocation of overhead expenditure"). Because the Chinese Respondents did not challenge this failure to exhaust rationale in its opening brief, this argument is waived. *See*

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).  Accordingly, we conclude Commerce did not err by relying on the Oceana Report to calculate surrogate financial ratios.

CONCLUSION

We have considered the Chinese Respondents' remaining arguments and find them unpersuasive.  For the foregoing reasons, the Judgment of the U.S. Court of International Trade is

**AFFIRMED**