# United States Court of Appeals for the Federal Circuit

---

**ABB, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**HYOSUNG CORPORATION, HICO AMERICA SALES AND TECHNOLOGY, INC.,**
*Defendants*

**v.**

**HYUNDAI HEAVY INDUSTRIES CO., LTD., HYUNDAI CORPORATION, USA,**
*Defendants-Appellants*

---

2018-1300

---

Appeal from the United States Court of International Trade in No. 1:15-cv-00108-MAB, Judge Mark A. Barnett.

---

Decided: April 5, 2019

---

ROBERT ALAN LUBERDA, Kelley Drye & Warren, LLP, Washington, DC, argued for plaintiff-appellee. Also represented by MELISSA M. BREWER, DAVID C. SMITH, JR.

JOHN JACOB TODOR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JEANNE DAVIDSON, FRANKLIN E. WHITE, JR., JOSEPH H. HUNT; CHRISTOPHER HYNER, United States Department of Commerce, Washington, DC.

DAVID EDWARD BOND, White & Case LLP, Washington, DC, argued for defendants-appellants. Also represented by RON KENDLER.

————————————

Before MOORE, SCHALL, and STOLL, *Circuit Judges.*

SCHALL, *Circuit Judge.*

Hyundai Heavy Industries, Co., Ltd. and Hyundai Corporation, USA (collectively, "Hyundai"), appeal the decision of the United States Court of International Trade in *ABB, Inc. v. United States*, 273 F. Supp. 3d 1186 (2017) ("*ABB II*"). In that decision, the Court of International Trade sustained the remand determination of the Department of Commerce ("Commerce") in the first administrative review of the antidumping duty order on large power transformers from the Republic of Korea ("Korea").

The issue before us is a narrow one. It is whether the Court of International Trade erred in affirming Commerce's determination to not make a circumstances of sale adjustment to normal value under 19 U.S.C. § 1677b(a)(6)(C)(iii) in the form of a commission offset, where Hyundai, the party seeking the adjustment, incurred no commission expenses on home market sales and no commission expenses outside the United States on U.S. sales, but did incur commission expenses inside the United States on constructed export price sales in the United States. Finding no error in the decision of the court, we affirm.

BACKGROUND

I.

The antidumping statute provides for the assessment of duties on foreign merchandise being, or likely to be, sold in the United States "at less than its fair value." 19 U.S.C. § 1673.[1] An antidumping investigation is initiated when a domestic industry petitions Commerce to investigate allegations of such sales. *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1373 (Fed. Cir. 2007). At the end of the investigation, if Commerce and the U.S. International Trade Commission ("ITC") have made the requisite determinations, Commerce publishes an order that directs customs officers to assess antidumping duties on imports of goods covered by the investigation. 19 U.S.C. § 1673e(a); *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1220 (Fed. Cir. 2018). Each year after the order is published, if Commerce receives a request for an administrative review of the order, it reviews and determines the amount of any antidumping duty. 19 U.S.C. § 1675(a)(1).

For every administrative review, Commerce typically must "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f-1(c)(1). The weighted average dumping margin reflects the amount by which "'normal value' (the price a producer charges in its home market) exceeds . . . 'export price' (the price of the product

---

[1] In June 2015, Congress amended various statutes relating to antidumping. *See* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, §§ 501-07, 129 Stat. 362, 383–87 (2015). The amendments do not affect this appeal. *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793 (Aug. 6, 2015).

in the United States) or 'constructed export price.'" *See U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)). "Commerce uses a constructed export price [("CEP")] if 'before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter.'" *Id.* at 1353 n.1 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163 ("SAA")); see 19 U.S.C. § 1677a(b).

This case arises out of an antidumping duty order on large power transformers from Korea. *Large Power Transformers from the Republic of Korea*, 77 Fed. Reg. 53,177 (Dep't of Commerce Aug. 31, 2012) (antidumping duty order) ("*Antidumping Duty Order*"). The *Antidumping Duty Order* resulted from an antidumping duty investigation initiated by Commerce on August 10, 2011 in response to a request by various petitioners, including ABB Inc. ("ABB"). *See Large Power Transformers from the Republic of Korea*, 77 Fed. Reg. 9204 (Dep't of Commerce Feb. 16, 2012) (prelim. determination). The period of investigation was July 1, 2010, to June 30, 2011. *Id.* at 9205. Commerce selected Hyundai as a mandatory respondent in the investigation. *Id.*

On July 11, 2012, Commerce issued a final determination that imports of large power transformers from Korea were being, or were likely to be, sold in the United States at less than fair value. *Large Power Transformers from the Republic of Korea*, 77 Fed. Reg. 40,857 (Dep't of Commerce July 11, 2012) (final determination). On August 24, 2012, the ITC notified Commerce that a domestic industry in the United States was materially injured by reason of less-than-fair-value imports of large power transformers from Korea. *Antidumping Duty Order*, 77 Fed. Reg. at 53,177.

One week later, Commerce issued the *Antidumping Duty Order*.

## II.

## A.

On October 2, 2013, Commerce initiated the first administrative review of the *Antidumping Duty Order*. The review covered the period February 16, 2012, through July 31, 2013. *Initiation of Antidumping and Countervailing Duty Admin. Reviews and Req. for Revocation in Part*, 78 Fed. Reg. 60,834, 60,836 (Dep't of Commerce Oct. 2, 2013). The purpose of the review was to determine whether Hyundai had sold large power transformers in the United States at less than fair value during the period of review.[2] Consistent with its standard antidumping questionnaire, Commerce asked Hyundai to report whether it had incurred commissions for sales of the subject merchandise in the United States or in its home market. J.A. 169, 171–72. In response, Hyundai reported that it had incurred commissions on U.S. sales but not on sales in the Korean market. *Id.*

On September 24, 2014, Commerce published the preliminary results of its 2012–2013 review. *Large Power Transformers from the Republic of Korea*, 79 Fed. Reg. 57,046 (Dep't of Commerce Sept. 24, 2014) (prelim. admin. review) ("*Preliminary Results*"); *see* Mem. from David Cordell, Int'l Trade Analyst, to the File, *Analysis of Data Submitted by [Hyundai] in the Prelim. Results of the 2012–2013 Admin. Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea*,

---

[2] Hyosung Corp. was a party to the first administrative review and, along with HICO America Sales and Technology, Inc. (collectively, "Hyosung"), was a defendant in the proceedings in the Court of International Trade. Hyosung is not a party to this appeal, however.

(Dep't of Commerce Sept. 18, 2014) ("*Preliminary Analysis Memorandum*"). J.A. 173–74. In the *Preliminary Analysis Memorandum*, Commerce stated that Hyundai had reported no commissions in the home market, and that the only commissions paid were "incurred in the United States." J.A. 182, 185.[3] Commerce made no explicit reference in the *Preliminary Analysis Memorandum* to granting or denying a commission offset under 19 C.F.R. § 351.410(e).[4] Commerce stated, however, that it was including "COMMU" under the programming field "USCOMM" for "U.S. Commission Expenses." J.A. 182.[5]

---

[3]    Commerce used constructed export price in accordance with 19 U.S.C. § 1677a(b) because Hyundai's U.S. sales were made through a seller affiliated with the producer in Korea. *Preliminary Analysis Memorandum*, J.A. 180 & Appellants Br. 5.

[4]    Section 351.410(e) states that Commerce "normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under consideration[], and no commission is paid in the other market under consideration." As discussed in more detail below, the regulation implements 19 U.S.C. § 1677b(a)(6)(C)(iii), the statute providing for circumstances of sale adjustments to normal value.

[5]    In the standard dumping questionnaire, field "COMMU" is defined as "unit cost of commissions paid to selling agents and other intermediaries." J.A. 171. Field "USCOMM," is "meant to capture all commissions on [export price] sales, and those on [constructed export price] sales, incurred *outside* of the [United States]." Mem. from Abdelali Elouaradia, Acting Office Director, to James Maeder, Sr. Office Director, *Am. Final Results of the Antidumping Duty Admin. Review of Large Power Transformers from the Republic of Korea; 2012–2013: Allegations of*

This programming language evidently effected such an offset. *See* ABB Br. 21, 24.

Commerce issued the final results of its 2012–2013 review on March 31, 2015. *Large Power Transformers from the Republic of Korea*, 80 Fed. Reg. 17,034 (Dep't of Commerce Mar. 31, 2015) (final admin. review) ("*Final Results*"). In the *Final Results*, Commerce determined that Hyundai's weighted-average dumping margin for the 2012–2013 period of review was 9.53 percent. *Id.* at 17,035.

In response, ABB filed an allegation of ministerial error in the *Final Results*, requesting that Commerce take Hyundai's U.S. commissions and other expenses into account in the calculation of constructed export price profit, as required by 19 U.S.C. § 1677a(d)(3).[6] J.A. 216–20.

---

*Ministerial Errors* at 3 (Dep't of Commerce Apr. 28, 2015) ("*Amended Final Results Memorandum*"), J.A. 232.

[6] Subsection (d) of 19 U.S.C. § 1677a states, in relevant part:

(d) Additional adjustments to constructed export price

For purposes of this section, the price used to establish constructed export price shall also be reduced by–

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise . . .

(A) commissions for selling the subject merchandise in the United States; . . . and

Commerce agreed that this was indeed a ministerial error and stated that it intended to correct it. *Amended Final Results Memorandum*, at 1–2, J.A. 230–31. Commerce also indicated that it had erred in including commissions that Hyundai had incurred in the United States in the programming field USCOMM. "Instead, these expenses should have been captured in field CEPOTHER," which "is meant to capture any other CEP expenses (incurred in the U.S.) commissions, direct selling, further manufacturing, *etc.*" *Id.* at 3, J.A. 232; *see Large Power Transformers from the Republic of Korea*, 80 Fed. Reg. 26,001 (Dep't of Commerce May 6, 2015) (am. final admin. review) ("*Amended Final Results*"). In its *Amended Final Results*, Commerce determined Hyundai's dumping margin to be 13.82 percent. *Amended Final Results* at 26,002.

Hyundai then filed its own allegation of ministerial error, noting that under Commerce's analysis in the *Amended Final Results*, Hyundai was no longer receiving a home market commission offset because Commerce considers field USCOMM in calculating such an offset, but not field CEPOTHER. J.A. 235–38. Responding, Commerce agreed with Hyundai that "by including commissions in the CEPOTHER field we inadvertently failed to account for the commission offset as we originally intended (and did) in the preliminary and final results." *Large Power Transformers from the Republic of Korea*, 80 Fed. Reg. 35,628, 35,629 (Dep't of Commerce June 22, 2015) (second am. final admin. review) ("*Second Amended Final Results*"). In a memorandum to the file, Commerce explained that it had made

---

(3) the profit allocated to the expenses described in paragraph[] (1) . . . .

ABB did not take issue with Commerce's deduction of Hyundai's U.S. commission expenses to establish constructed export price under § 1677a(d)(1).

the following corrections in response to Hyundai's claim of ministerial error:

> We first moved U.S. commission expenses (field COMMU) from field "CEPOTHR" [sic] back to field "USCOMM" in the U.S. Margin Program. . . .

> We next added field USCOMM to the constructed export price (CEP) profit calculation, and we deducted it from the U.S. net price calculation . . . to ensure that all U.S. selling expenses are accounted for in the calculation of CEP Profit, which was the basis of Petitioner's initial ministerial allegation. . . .

> Finally we made . . . changes to the Macro Program to ensure that the U.S. commissions (field USCOMM), which was deducted from the CEP string, is not added back into normal value.

Mem. from David Cordell, Int'l Trade Compliance Analyst, to the File, *Analysis of Data Submitted by [Hyundai] in the Second Am. Final Results of the Antidumping Duty Admin. Review of Large Power Transformers from the Republic of Korea; 2012–2013* (Dep't of Commerce June 15, 2015) ("*Second Amended Final Results Memorandum*"). J.A. 243–44. In the *Second Amended Final Results*, Hyundai's weighted-average dumping margin for the 2012–2013 period of review was 12.36 percent. *Second Amended Final Results* at 35,269.

## B.

ABB filed suit in the Court of International Trade challenging, among other things, Commerce's grant of a home market commission offset to Hyundai. *ABB, Inc. v. United States*, 190 F. Supp. 3d 1159, 1164 (Ct. Int'l Trade 2016) ("*ABB I*"). Hyundai received a commission offset to normal value when Commerce "moved U.S. commission expenses (field COMMU) from field 'CEPOTHR' [sic] back to field 'USCOMM' in the U.S. Margin Program." J.A. 243. ABB

argued that because Hyundai incurred its U.S. commission expenses inside the United States, Hyundai should not receive a commission offset to normal value. *ABB I*, 190 F. Supp. 3d at 1182. Hyundai responded that ABB had waived any challenge to the commission offset by failing to exhaust its administrative remedies before Commerce after receiving the *Preliminary Results* and the *Preliminary Analysis Memorandum. See id.* at 1182–83.[7] ABB replied that it timely raised the issue because Commerce announced changes to its treatment of Hyundai's U.S. commissions in the *Amended Final Results* and the *Second Amended Final Results. Id.* at 1183.

The Court of International Trade determined in *ABB I* that Commerce's determination to grant a home market commission offset was inconsistent with Commerce's finding that Hyundai's commission expenses "were *incurred in the United States.*" *Id.* at 1183 (quoting *Preliminary Analysis Memorandum* at 10, 13). The court also found the *Preliminary Analysis Memorandum* "devoid of any reference to a commission offset." *Id.* The court continued, noting that by excluding U.S. commissions from the field that would normally include them, CEPOTHER, and instead including them in the USCOMM field in the *Second Amended Final Results*, Commerce suggested that it treated the commissions as if they were incurred *outside* the United States. *Id.* The court also noted that the margin calculation program accompanying the *Second Amended Final Results*

---

[7]    As noted above, it was not until the *Final Results* were issued that ABB alleged error. Even then, ABB claimed ministerial error only in Commerce's failure to take Hyundai's U.S. commissions and other expenses into account in the calculation of constructed export price profit, as required by 19 U.S.C. § 1677a(d)(3). ABB did not allege error in the granting of a home market commission offset under 19 C.F.R. § 351.410(e).

itself indicated that CEPOTHER would include constructed export price commissions incurred in the United States and that the description for the USCOMM field specifically stated "[d]o NOT include commissions on [constructed export price] sales incurred in the U.S. here." *Id.* (quoting *U.S. Margin Program Output (Second Amended Final Results)* (Dep't of Commerce June 2015)). "Thus," the court concluded, "Commerce's treatment of U.S. commissions . . . [was] inconsistent with its characterization of those commissions in the Second Amended Final Results." *Id.* at 1183–84.

The Court of International Trade also found that ABB did not exhaust its administrative remedies regarding the commission offset issue but that, in the circumstances of the case, exhaustion was not required:

> Despite Commerce's general policy with respect to the treatment of U.S. commissions incurred inside and outside the United States, the Preliminary Analysis Memo indicates that Commerce was diverging from that policy. Nevertheless, Commerce did not discuss the implications of this divergence on whether it would provide a commission offset in this case. The Court finds that it is not appropriate to require ABB to have exhausted its administrative remedies in this case when Commerce failed to adequately address its treatment of commission offsets in the preliminary determination. Such notice was necessary in this particular case because Commerce indicated that it was not treating the U.S. commissions in accordance with its normal practice, but it did not explain the extent of its different treatment.

*ABB I*, 190 F. Supp. 3d at 1184 (citations omitted).

The court remanded for Commerce "to explain its treatment of the respondents' U.S. commissions, the record basis for such treatment, whether such U.S. commissions

result in the granting of commission offsets, and the legal and factual basis for the granting or denial of the commission offsets." *Id.*

## C.

As discussed in more detail below, on remand Commerce concluded that the evidence indicated that Hyundai's U.S. commissions were incurred inside the United States and that, as a result, a home market commission offset should not have been granted. *Final Results of Redetermination Pursuant to Court Remand*, 1:15-cv-00108-MAB, ECF No. 105, ("*Remand Results*"), J.A. 81. As a result, Commerce determined Hyundai's dumping margin to be 13.82 percent. J.A. 123–24. The Court of International Trade sustained the *Remand Results* in *ABB II*. The court determined that Commerce properly deducted Hyundai's U.S. commissions under § 1677a(d)(1)(A) to arrive at constructed export price. *See ABB II*, 273 F. Supp. 3d at 1194. The court also determined that Commerce did not err in not granting a home market commission offset under 19 U.S.C. § 1677b(a)(6)(C)(iii) and its implementing regulation, 19 C.F.R. § 351.410(e). *Id.* at 1197.

Hyundai appeals, arguing that the Court of International Trade (1) abused its discretion by excusing ABB's failure to exhaust its administrative remedies, and (2) erred when it sustained Commerce's denial of a commission offset. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). We address the exhaustion issue first.

### DISCUSSION

### I.

Congress has directed the Court of International Trade to, "where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). As noted, in this case, the Court of International Trade found that ABB had not exhausted its administrative remedies with respect to

its argument concerning the home market commission offset that Commerce granted Hyundai in the *Second Amended Final Results. ABB I*, 190 F. Supp. 3d at 1184. Nevertheless, the court determined that it would not "[be] appropriate to require ABB to have exhausted its administrative remedies . . . when Commerce failed to adequately address its treatment of commission offsets in the preliminary determination." *Id.* Citing *Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017), Hyundai argues that the Court of International Trade erred in waiving ABB's failure to exhaust its administrative remedies. Therefore, according to Hyundai, we should vacate the decisions of the court in *ABB I* and *ABB II* with respect to Hyundai and reinstate the *Second Amended Final Results*. Appellants Br. 14–18. We disagree.

We have stated that "the Court of International Trade . . . enjoys discretion to identify circumstances where exhaustion of administrative remedies does not apply." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003) (citing *Cemex, S.A. v. United States*, 133 F.3d 897, 905 (Fed. Cir. 1998)); *see China Kingdom (Beijing) Imp. & Exp. Co. v. United States*, No. 2018-1375, 2019 WL 1030071, at \*6 (Fed. Cir. Mar. 5, 2019) ("[Section] 2637(d) affords the [Court of International Trade] discretion through its inclusion of its 'where appropriate' clause." (citations omitted)). Accordingly, we review the Court of International Trade's exhaustion determination for an abuse of discretion. *See China Kingdom*, 2019 WL 1030071, at \*5. We conclude that, in this case, the court did not abuse its discretion in determining that it would not be appropriate to require ABB to have exhausted its administrative remedies. In our view, the circumstances identified by the court in *ABB I*—Commerce's divergence from its general policy with respect to the treatment of U.S. commissions incurred inside and outside the United States and its failure to discuss the implications of this divergence for this case—constituted "a strong contrary reason" for

departing from the mandate of § 2637(d). *See Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("Although [the] statutory injunction is not absolute, it indicates a congressional intent that, *absent a strong contrary reason*, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." (emphasis added)). In other words, we conclude that legitimate, prudential concerns warranted both waiver of ABB's failure to exhaust its administrative remedies and a remand to Commerce for further consideration of the issue.

*Boomerang Tube*, upon which Hyundai relies, also involved an antidumping investigation. In that case, at the request of the petitioners, including Boomerang Tube LLC ("Boomerang") and United States Steel Corporation ("U.S. Steel"), Commerce initiated an investigation into whether oil country tubular goods ("OCTGs") from Saudi Arabia and other countries were being sold for less than fair value in the United States. *Boomerang Tube*, 856 F.3d at 909; *see also Boomerang Tube LLC v. United States*, 125 F. Supp. 3d 1357, 1359 (Ct. Int'l Trade 2015). For purposes of the investigation, Commerce selected Duferco SA ("Duferco"), the Saudi Arabian exporter for Jubail Energy Services Company ("JESCO"), as the sole mandatory respondent, JESCO being a voluntary respondent. *Boomerang Tube*, 856 F.3d at 909–10. JESCO had no viable home market sales so, in Commerce's preliminary determination, Commerce determined constructed value using sales of OCTGs by Saudi Steel Pipes Company ("Saudi Steel") under 19 U.S.C. § 1677b(e)(2)(B)(iii), which provides for using "any other reasonable method" in determining constructed value when normal value cannot be determined. *Id.* at 910 (quoting 19 U.S.C. § 1677b(e)(2)(B)(iii)); 19 U.S.C. § 1677b(a)(4). Subsequently, Boomerang challenged Commerce's reliance on the financial statements of Saudi Steel. *Id.* Duferco and JESCO argued in response that Commerce should continue to use Saudi Steel's financial statements or the financial statements of another

Saudi entity. In the alternative, Duferco and JESCO argued that Commerce should calculate constructed value using the profit data from JESCO's sales of OCTGs to its affiliated Colombian distributor, which JESCO had previously submitted to Commerce. *Id.* at 910–11. In its rebuttal brief, Boomerang argued against using JESCO's Colombian sales. *Id.* at 911. It did not argue, however, that the affiliated Colombian distributor was a member of the Duferco entity, or that the Colombian sales were intra-company sales. *Id.*

In its final determination, Commerce calculated constructed value profit using JESCO's sales to its affiliated Colombian distributor. It did so because it viewed those sales as "the best available option" for making the calculation. *Id.* After correcting for a ministerial error, Commerce issued an amended final determination that imposed no antidumping duties because the dumping margin was de minimis. On appeal to the Court of International Trade, Boomerang and U.S. Steel argued that JESCO's sales to the Colombian distributor were intra-company transfers and therefore not an appropriate basis to calculate constructed value profit. *Id.* The Court of International Trade determined that although Boomerang and U.S. Steel did not make this argument before Commerce, requiring exhaustion was not warranted because Boomerang and U.S. Steel did not know Commerce was considering using the Colombian sales until it issued its final determination. *Id.* The court therefore ruled that it would "adjudicate[] on the merits the claims of all plaintiffs in th[e] litigation." *Id.* at 912 (quoting 125 F. Supp. 3d at 1363). Addressing the merits, the Court of International Trade affirmed Commerce's treatment of the Colombian distributor as a separate entity. *Id.* Accordingly, it left in place Commerce's determination of a de minimis dumping margin. *Id.*

On appeal, this court held that the Court of International Trade erred in waiving the exhaustion requirement. Specifically, we determined that the court abused its

discretion in two respects. We stated first that the court's decision was "legally erroneous" to the extent that it stood for the proposition that Commerce must expressly notify parties that it intends to change its methodology between its preliminary and final determination, despite the inclusion of the relevant data in the record and the advancement of arguments related to that data before Commerce. *Id.* at 913. Second, we stated that the Court of International Trade's ruling was based upon the clearly erroneous finding of fact that Boomerang and U.S. Steel did not have an opportunity to raise their intra-company transfer objection to the use of the Colombian data. Noting that it was "undisputed that the data regarding JESCO's transactions with the affiliated distributor were in the record prior to Commerce's preliminary determination," we stated that Boomerang and U.S. Steel "either knew or should have known" that Commerce might consider the data. *Id.* We observed that Boomerang's rebuttal brief to Commerce revealed that Boomerang recognized and objected to JESCO's suggestion to use the Colombian data for constructed value profit, but that Boomerang did not argue that this was an intra-company transfer. *See id.* Thus, we found that Boomerang's and U.S. Steel's intra-company transfer argument was not exhausted and should not have been considered by the Court of International Trade. *Id.* We therefore held that the court should have dismissed Boomerang and U.S. Steel's appeal without reaching the merits and that it abused its discretion by failing to do so. We accordingly vacated the court's decision and remanded for further proceedings consistent with our opinion.

Our decision in *Boomerang Tube* rested on the determination that the Court of International Trade's decision with respect to waiver was based upon legal error and a clearly erroneous finding of material fact, neither of which exists here. Rather, in this case, the court exercised its discretion to excuse ABB's failure to exhaust because the *Preliminary Results* and *Preliminary Analysis Memorandum*

showed that Commerce was diverging without adequate explanation from its usual treatment of commissions paid on U.S. sales. *See Preliminary Results*, 79 Fed. Reg. at 57,046; *Preliminary Analysis Memorandum* at J.A. 182, 185; *Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1379 (Fed. Cir. 2004) ("[W]hile an agency is free to change its policy based on either a change of circumstances or a changed view of the public interest, 'an agency [that] chang[es] its course must supply a reasoned analysis' for the change." (quoting *Motor Vehicle Mfrs. Ass'n of United States v. State Farm*, 463 U.S. 29, 57 (1983))). *Boomerang Tube* plainly is different from this case.

We turn now to the merits of Hyundai's appeal.

## II.

### A.

We review a decision of the Court of International Trade de novo, applying anew the standard used by that court in reviewing the decision of Commerce. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015) (citing *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008)). We uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Although we review the decisions of the Court of International Trade de novo, we give great weight to the informed opinion of the Court of International Trade and it is nearly always the starting point of our analysis. *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016).

### B.

In the *Remand Results*, Commerce found that Hyundai's U.S. commissions were incurred only inside the United States, which Hyundai does not dispute. Hyundai also does not dispute that Commerce properly deducted the

commissions incurred inside the United States from the price used in calculating constructed export price under 19 U.S.C. § 1677a(d)(1)(A). Rather, Hyundai challenges Commerce's refusal to provide a commission offset as a circumstances of sale adjustment to normal value under 19 U.S.C. § 1677b(a)(6)(C)(iii) and 19 C.F.R. § 351.410(e).

Section 1677b(a) of 19 U.S.C. states:

> In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value. In order to achieve a fair comparison with the export price or constructed export price, normal value shall be determined as follows . . . .

Subsection (6)(C)(iii) of § 1677b(a) provides for an adjustment to normal value, i.e., the price at which the foreign product is sold in the exporting country, such that normal value "shall be . . . increased or decreased by the amount of any difference (or lack thereof)" between normal value and export price or constructed export price due to "other differences in the circumstances of sale."

The regulation set forth at 19 C.F.R. § 351.410, titled "Differences in circumstances of sale," implements § 1677b(a)(6)(C)(iii). It states:

> (e) *Commissions paid in one market.* The Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under consideration[], and no commission is paid in the other market under consideration. The Secretary will limit the amount of such allowance to the amount of the other selling expenses

incurred in the one market or the commissions allowed in the other market, whichever is less.

In the *Remand Results*, Commerce determined that "when the commission expenses on U.S. sales are incurred in the United States and there are no commission expenses in the home market, which is the case here, such commission expenses are treated as CEP selling expenses and the commission expenses and allocated profit get deducted from the price used to establish CEP [under § 1677a(d)], and . . . there are no home market commission offsets granted." J.A. 118. "It is because such commissions for U.S. sales are only associated with economic activities occurring in the United States," Commerce added. J.A. 118–19. Commerce stated that although the statute and regulations do not distinguish directly between commissions incurred inside or outside the United States, Commerce takes into account the language of the statute and the SAA, which does consider whether commissions were paid in the United States. J.A. 115–16.[8] Specifically, the SAA provides:

> [U]nder [19 U.S.C. § 1677a(d)], constructed export price will be calculated by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the following expenses (and profit) associated with economic activities

---

[8] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

*occurring in the United States*: (1) *any commissions paid in selling the subject merchandise . . . .*

. . . Commerce is directed by [19 U.S.C. § 1677a(d)(1)(A)] to deduct commissions from constructed export price, *but only to the extent that they are incurred in the United States on sales of the subject merchandise.*

. . . .

. . . In constructed export price situations Commerce will deduct direct expenses incurred in the United States from the starting price in calculating the constructed export price. However, direct expenses and assumptions of expenses incurred in the foreign country on sales to the affiliated importer will form a part of the circumstances of sale adjustment.

SAA at 823, 828, 1994 U.S.C.C.A.N. at 4163, 4167 (emphasis added).

Commerce explained that, "[i]n light of the statute and regulations," its practice has been "to distinguish two types of commissions paid on U.S. sales." J.A. 108. The first type is commissions incurred *inside* the United States, such as those in this case, for which Commerce arrives at constructed export price by deducting commissions and any related profit from the price used to establish constructed export price. *Id.*[9] In the case of commissions paid *outside*

---

[9]    Commerce stated that in the standard margin program, commission expenses on U.S. sales incurred in the United States are included in field CEPOTHER, which is, along with a field for its corresponding profit, deducted from the U.S. price used to establish constructed export price, as required by 19 U.S.C. § 1677a(d)(1)(A) and (3). J.A. 112–13.

the United States on U.S. sales, and there were no such commissions here, Commerce explained that it "adds such commission expenses to normal value and offsets differences in home market commission expenses and such U.S. commission expenses incurred outside the United States, if any." *Id.*[10] Commerce stated that, by granting home market commission offsets in the form of an additional adjustment to normal value when U.S. commission expenses for the respective U.S. sales are incurred outside the United States, "a more appropriate *apples-to-apples* comparison between two markets can be achieved because such offsets capture the corresponding economic activities and associated expenses in the home market for the matching home market sales, while the commission expenses for U.S. sales [incurred outside of the United States] are added to normal value." *Id.* at 109–10. Commerce stated:

---

[10] According to Commerce, commission expenses on U.S. sales incurred outside the United States are included in field USCOMM. Commerce explained that its standard margin program uses three sequential conditions to determine if commission offsets will be granted or denied in the calculation of normal value. J.A. 113. First, when home market commission expenses (field "COMMDOL" in the program) exceed USCOMM, a home market commission offset is granted to increase normal value, and thereby increase the dumping margin. When USCOMM is greater than COMMDOL, a home market commission offset is granted to decrease normal value, and thereby decrease the dumping margin. When USCOMM and COMMDOL are equal, there is no commission offset. Thus, when, as in this case, there are no U.S. commission expenses incurred outside the United States (USCOMM is zero), and no home market commissions are incurred (COMMDOL is zero), there are no commission offsets granted. *See* J.A. 113–14.

> Because commissions incurred in the United States are not related to economic activities in the home market, there is no basis for granting a home market commission offset. Therefore, when commissions are incurred in the United States, our normal practice is to treat them as CEP selling expenses and to deduct [them] from the U.S. sales, with profit, while not granting a commission offset to normal value.

J.A. 111. Thus, in the *Remand Results*, Commerce construed 19 U.S.C. § 1677b(a)(6)(C)(iii) as not requiring a circumstances of sale adjustment in the form of a commission offset when there are no commission expenses incurred in the home market and no commission expenses (on U.S. sales) incurred outside the United States, because § 1677a(d) provides a specific way for Commerce to take into account commission expenses incurred inside the United States, the only type of commission expenses at issue in this case. *Id.* at 107–16. Commerce stated that its interpretation of § 1677b(a)(6)(C)(iii) is consistent with the intent of the statute and the SAA, "thereby making a fair and equitable comparison between normal value and U.S. price through the granting of home market commission offsets when commissions on U.S. sales are incurred outside the United States while denying such offsets when commissions on U.S. sales are incurred inside the United States, because such commissions incurred in the United States are treated as CEP selling expenses, pursuant to [19 U.S.C. § 1677a(d)]." *Id.* at 116. Specifically addressing § 351.410(e), Commerce stated that "[19 U.S.C. § 1677b](a)(6)(C)(iii) . . . , which is the legal basis for the regulation, requires the Department to make adjustments to normal value based on other differences in the circumstances of sale." Commerce continued, stating that although § 351.410(e) does not explicitly discuss an adjustment regarding a geographic distinction of U.S.

commissions, Commerce's practice with regard to commission offsets is consistent with § 1677b(a)(6)(C)(iii). *Id.*

C.

As noted, in *ABB II*, the Court of International Trade sustained Commerce's *Remand Results*. 273 F. Supp. 3d at 1200. The court began its analysis by noting that, although 19 U.S.C. § 1677a(d)(1)(A)[11] does not contain a geographical distinction on where commissions must be incurred, Commerce's implementing regulation references commissions that are *associated with commercial activity occurring in the United States. Id.* at 1194. The court further noted that the regulation provides that such commissions be treated as adjustments in the determination of constructed export price. *Id.* That regulation, set forth at 19 C.F.R. § 351.402(b), provides that "[i]n establishing constructed export price [under 19 U.S.C. § 1677a(d)], the Secretary will make adjustments for expenses *associated with commercial activities in the United States* that relate to the sale to an unaffiliated purchaser, no matter where or when paid." (Emphasis added.)

The Court of International Trade further noted that the SAA, which forms the rationale for the regulation, states that "[i]n constructed export price situations Commerce will deduct direct expenses incurred in the United States from the starting price in calculating the constructed export price. However, *direct expenses and assumptions of expenses incurred in the foreign country on sales to the affiliated importer will form a part of the circumstances of sale adjustment* [provided for in 19 U.S.C. § 1677b(a)(6)(C)(iii)]." *ABB II*, 273 F. Supp. 3d at 1195 (quoting SAA at 828, 1994 U.S.C.C.A.N. at 4167 (emphasis in *ABB II*)). Thus, the court observed, the "SAA

---

[11]    Subsection (d) of 19 U.S.C. § 1677a is titled "Additional adjustments to constructed export price."

limits the circumstances of sale adjustment, including the home market commissions offset, *to direct expenses and assumptions of expenses incurred in the foreign country on sales to the affiliated importer.*" *Id.* The Court of International Trade concluded its examination of the circumstances of sale adjustment by quoting the following statement from the SAA:

> [19 U.S.C. § 1677b(a)(6)(C)] authorizes Commerce to adjust normal value to account for other differences . . . between export price (or constructed export price) and normal value that are wholly or partly due to differences in quantities, physical characteristics, or other differences in the circumstances of sale. *With respect to each of these adjustments, as well as all other adjustments, Commerce will ensure that there is no overlap or double-counting of adjustments.*

*Id.* (quoting SAA at 828, 1994 U.S.C.C.A.N. at 4167) (emphasis in *ABB II*).

Having considered 19 U.S.C. § 1677b(a)(6)(C)(iii), the Court of International Trade turned to Hyundai's argument that it was entitled to a circumstances of sale adjustment to normal value under 19 C.F.R. § 351.410(e). *See ABB II*, 273 F. Supp. 3d at 1196–97. The court rejected this argument. "Commerce," the Court of International Trade said, "correctly stated [in the *Remand Results*] that § 1677b(a)(6)(C)(iii), the statutory basis for 19 C.F.R. § 351.410(e), requires [Commerce] 'to make adjustments to *normal value* based on *other* differences in the circumstances of sale.'" *Id.* (quoting J.A. at 115–16 (first emphasis added, second emphasis in *ABB II*)). The court noted that the commissions in question were incurred in the United States on *constructed export price* sales, yet Hyundai sought an adjustment under provisions for calculating *normal value* "instead of relying on the statutory provision that governs *constructed export price* calculation, the

regulation implementing that provision, and its legislative history." *Id.* at 1196 (emphasis added). The Court of International Trade thus endorsed Commerce's decision in the *Remand Results* to not grant a commission offset to normal value where there were no commission expenses incurred in the home market on home market sales and no commission expenses incurred outside the United States on U.S. sales, but only commission expenses incurred inside the United States on U.S. sales.

D.

Our review of Commerce's interpretation and implementation of a statutory scheme is governed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron's* two-part framework, we first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, "that is the end of the matter," and we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. A permissible construction of a statute is one that is reasonable. *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1369–70 (Fed. Cir. 2011).

The "precise question" at issue in this case is whether, under 19 U.S.C. § 1677b(a)(6)(C)(iii), Commerce should adjust normal value through a commission offset, when no commission expenses are incurred on home market sales and no commission expenses are incurred outside the United States on U.S. sales, but commission expenses are incurred inside the United States on constructed export price sales in the United States. The language of 19 U.S.C. § 1677b(a)(6)(C)(iii), as well as the analysis of Commerce in the *Remand Results* and the analysis of the Court of International Trade in *ABB II*, make clear that Congress has not spoken to this question. Indeed, on

appeal neither Hyundai, nor ABB, nor the government argues otherwise.  Thus, we must determine whether Commerce's construction of 19 U.S.C. § 1677b(a)(6)(C)(iii) in this case was reasonable.

Hyundai argues that Commerce's approach is unreasonable because "it results in asymmetric adjustments that arbitrarily increase dumping margins and causes similar situations to be treated differently." Appellants Br. 20.  In making this argument, Hyundai starts from the premise that, regardless of whether an adjustment for expenses is made directly to export price/constructed export price or to normal value, or whether an adjustment is made by adjusting normal value to compensate for the differences between the expenses incurred on export price/constructed export price sales and sales used as normal value, a "symmetrical adjustment" must be made. Appellants Br. 21–22.  According to Hyundai, this is consistent with the statutory requirement that "a fair comparison shall be made between the export price or constructed export price and normal value." *Id.* at 22 (citing 19 U.S.C. § 1677b(a)).  Hyundai also argues that this symmetry is required by Commerce's regulation at 19 C.F.R. § 351.410(e), which states that "[t]he Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under consideration[], and no commission is paid in the other market under consideration." Appellants Br. 19.  Most importantly for Hyundai, the regulation sets forth only a single condition for making a commission offset: "a reasonable allowance [is made] for commissions in one of the markets under consideration[], and no commission is paid in the other market under consideration." *See* Appellants Br. 24 (quoting 19 C.F.R. § 351.410(e)).

Hyundai seeks to buttress its argument by positing six scenarios that it says result from Commerce's "interpretation of the commission offset regulation" in the *Remand*

*Results*. Appellants Br. 26.[12] Hyundai takes the position that the only one of these scenarios in which a commission offset is not applied to normal value is the scenario that applies in this case, Scenario 6, where no commissions were incurred in the home market or outside the United States on U.S. sales, but commissions were incurred inside the United States on constructed export price sales in the United States. Hyundai argues that Commerce's approach in the *Remand Results* thus results in "disparate treatment

---

[12]   Hyundai presents the following six scenarios:

Scenario 1: "U.S. EP Sale–Commissions Are Incurred in the Country of Export on Sales Used as Normal Value–No Commissions Are Incurred on U.S. Sales";

Scenario 2: "U.S. EP Sale–No Commissions Are Incurred in the Country of Export on Sales Used as Normal Value–Commissions Are Incurred *Outside* the United States on U.S. Sales";

Scenario 3: "U.S. EP Sale–No Commissions Are Incurred in the Country of Export on Sales Used as Normal Value–Commissions Are Incurred *Inside* the United States on U.S. Sales";

Scenario 4: "U.S. CEP Sale–Commissions Are Incurred in the Country of Export on Sales Used as Normal Value–No Commissions Are Incurred on U.S. Sales";

Scenario 5: "U.S. CEP Sale–No Commissions Are Incurred in the Country of Export on Sales Used as Normal Value–Commissions Are Incurred *Outside* the United States on U.S. Sales"; and

Scenario 6: "U.S. CEP Sale–No Commissions Are Incurred in the Country of Export on Sales Used as Normal Value–Commissions Are Incurred *Inside* the United States on U.S. Sales."

Appellants Br. 26–30.

of similar situations [that] is clearly unreasonable." Appellants Br. 30 (citing *Dongbu Steel Co.*, 635 F.3d at 1372–73).

In the *Remand Results*, Commerce found that Hyundai was not entitled to a circumstances of sale adjustment under 19 U.S.C. § 1677b(a)(6)(C)(iii) and 19 C.F.R. § 351.410(e). The basis for that finding was Commerce's determination that § 1677a(d) provides a specific way to take into account U.S. commission expenses that are incurred in the United States. Commerce's rationale is that when all commission expenses are incurred in the United States and there are no commission expenses incurred in the home market and no commission expenses incurred outside the United States on U.S. sales for which a compensation must be made, an "apples to apples comparison" of normal value to constructed export price (after deducting U.S.-incurred commissions) can be made without the need for a commission offset. *See* J.A. 115. At the same time, Commerce views its construction of § 351.410(e) as consistent with its interpretation of the statute. As the Court of International Trade noted, Commerce's approach in the *Remand Results* draws a distinction "between U.S. commissions that result in an adjustment in the determination of constructed export price and U.S. commissions that may, instead, result in a circumstance of sale adjustment or commission offset in the determination of normal value." *ABB II*, 273 F. Supp. 3d at 1193. Like the Court of International Trade, we conclude that Commerce's approach represents a reasonable construction of 19 U.S.C. § 1677b(a)(6)(C)(iii).

As noted above, the SAA states that "[i]n constructed export price situations Commerce will deduct direct expenses incurred in the United States from the starting price in calculating the constructed export price." SAA at 828, 1994 U.S.C.C.A.N. at 4167. "However," the SAA continues, "direct expenses and assumptions of expenses incurred in the foreign country on sales to the affiliated importer will form a part of the circumstances of sale adjustment." *Id.* Here, there were no "direct expenses and

assumptions of expenses incurred in the foreign country on sales to the affiliated importer" to form part of a circumstances of sale adjustment.

Commerce's approach is consistent with the SAA. The approach recognizes that a circumstances of sale adjustment to normal value based upon commission expenses incurred in the United States on constructed export price sales is not contemplated by 19 U.S.C. § 1677b(a)(6)(C)(iii) when, as here, there are no commission expenses incurred on home market sales and no commission expenses incurred outside the United States on U.S. sales. That is because, under these circumstances, there are no "direct expenses and assumptions of expenses in the foreign country on sales to the affiliated importer" to "form a part of the circumstances of sale adjustment." SAA at 828, 1994 U.S.C.C.A.N. at 4167. Moreover, once Commerce deducted the commission expenses incurred in the United States in calculating constructed export price, there was no difference in the circumstances of sales in the home market and the U.S. market for which an adjustment had to be made. That is because no commission expenses were ever incurred in the home market and no commission expenses were ever incurred outside the United States on U.S. sales, and because the commission expenses that were incurred in the U.S. market were deducted in the calculation of constructed export price. In other words, the circumstances of sales in the two markets were rendered the same–no commissions were paid in one market (the home market) and the commissions that were paid in the other market (the U.S. market) were deducted, or eliminated, in the calculation of constructed export price. The statute itself states that a circumstances of sale adjustment is directed to achieving a "fair comparison" between normal value and export price/constructed export price. 19 U.S.C. § 1677b(a). Commerce's approach achieves that goal by rendering the home market side of the equation and the U.S. market side of the equation comparable.

Commerce's approach also recognizes the SAA's command that "Commerce will ensure that there is no overlap or double-counting of adjustments." SAA at 828, 1994 U.S.C.C.A.N. at 4167; *see also* 19 C.F.R. § 351.401(b)(2) (prohibiting the double counting of adjustments). We thus agree with ABB, ABB Br. at 38, that to deduct the commissions from Hyundai's constructed export price sales under 19 U.S.C § 1677a(d)(1)(A) and then to account for them again by granting a commission offset under 19 U.S.C. § 1677b(a)(6)(C)(iii) would constitute impermissible double counting.

Finally, as noted above, Hyundai presents six scenarios to support its argument that Commerce's approach "unnecessarily treats one circumstance[, Scenario 6,] differently from all [the] others and, therefore, is unreasonable." Appellants Br. 25. Hyundai contends that *Dongbu Steel* therefore requires reversal. We are not persuaded by this argument. First, we have just explained why Commerce's approach in this case was reasonable. Second, Scenarios 1–5 are all based on hypothetical facts different from those before us. Thus, they do not present the situation of similar circumstances being treated differently. And third, Hyundai's reliance on *Dongbu Steel* is, in any event, misplaced. In *Dongbu Steel*, Commerce had interpreted a single statutory provision as having opposite meanings when applied to antidumping investigations and administrative reviews. 635 F.3d at 1365, 1371. Under those circumstances, we held that Commerce had failed to adequately explain why it had interpreted the statute inconsistently. *Id.* at 1372–73. We thus vacated the Court of International Trade's decision and remanded for further proceedings "to give Commerce the opportunity to explain its reasoning." *Id.* at 1373.[13] Here, as demonstrated above, unlike in *Dongbu*

_____

[13] After *Dongbu Steel*, we upheld Commerce's rationale for its differing interpretations in *Union Steel v.*

*Steel*, in the *Remand Results* Commerce fully explained its reasons and rationale for not granting Hyundai a commission offset.

## CONCLUSION

For the reasons stated above, we hold that Commerce's determination in the *Remand Results* represents a permissible interpretation of 19 U.S.C. § 1677b(a)(6)(C)(iii). We therefore affirm the decision of the Court of International Trade sustaining the *Remand Results*.

## **AFFIRMED**

## COSTS

Each party shall bear its own costs.

---

*United States*, 713 F.3d 1101, 1109–10 (Fed. Cir. 2013) ("No rule of law precludes Commerce from interpreting [the statute] differently in different circumstances as long as it provides an adequate explanation.").